[No. S066735. Apr. 8, 1999.]

CEL-TECH COMMUNICATIONS, INC., et al., Plaintiffs and Appellants,
v.
LOS ANGELES CELLULAR TELEPHONE COMPANY, Defendant and
Respondent.

**COUNSEL**

Spiegel Liao & Kagay and Charles M. Kagay for Plaintiffs and Appellants.

James R. McCall as Amicus Curiae on behalf of Plaintiffs and Appellants.

The Sturdevant Law Firm, James C. Sturdevant and Steven S. Kaufhold for Consumer Attorneys of California as Amicus Curiae on behalf of Plaintiffs and Appellants.

Thomas A. Papageorge, Deputy District Attorney (Los Angeles); and Lawrence Brown for California District Attorneys Association as Amicus Curiae on behalf of Plaintiffs and Appellants.

Milberg Weiss Bershad Hynes & Lerach, William S. Dato, Alan M. Mansfield; Altshuler, Berzon, Nussbaum, Berzon & Rubin, Fred H. Altshuler and Michael W. Graf for Natural Resources Defense Council, Environmental Law Foundation and Utility Consumers' Action Network as Amici Curiae on behalf of Plaintiffs and Appellants.

Gibson, Dunn & Crutcher, Robert C. Bonner, Rex S. Heinke, Mark Erich Weber, Joel S. Sanders, Kathleen M. Vanderziel and Theodore J. Boutrous for Defendant and Respondent.

Horvitz & Levy, Lisa Perrochet and David M. Axelrad for Truck Insurance Exchange as Amicus Curiae on behalf of Defendant and Respondent.

Latham & Watkins, John F. Walker, Jr., Peter W. Devereaux, Steven D. Atlee and Stephen J. Newman for the Los Angeles Area Chamber of Commerce as Amicus Curiae on behalf of Defendant and Respondent.

Wright & Talisman, Michael B. Day and Margaret A. Rostker for Cellular Carriers Association of California as Amicus Curiae on behalf of Defendant and Respondent.

Phillip E. Stano; Mayer, Brown & Platt, Evan M. Tager and Donald M. Falk for American Council of Life Insurance as Amicus Curiae on behalf of Defendant and Respondent.

Heller, Ehrman, White & McAuliffe, Paul Alexander, Vanessa Wells and Daniel Rockey for State Farm Insurance Companies and Symantec Corporation as Amici Curiae on behalf of Defendant and Respondent.

Fred J. Hiestand for the Association for California Tort Reform as Amicus Curiae on behalf of Defendant and Respondent.

Howard, Rice, Nemerovski, Canady, Falk & Rabkin, Jerome B. Falk, Jr., Pauline E. Calande; Sheppard, Mullin, Richter & Hampton, Gary L. Halling and Thomas D. Nevins for the Hearst Corporation and San Francisco Newspaper Printing Company as Amici Curiae.

Peter Arth, Jr.; Mark Fogelman; and Fred Harris for the Public Utilities Commission of the State of California as Amicus Curiae.

## OPINION

CHIN, J.—Defendant Los Angeles Cellular Telephone Company (L.A. Cellular) sells cellular telephones and services. Cellular telephones are sold on the open market. As to wholesale sales of cellular *services*, however, L.A. Cellular has a government-protected "duopoly" status with one other company. In an effort to gain new subscribers for its services and increase overall profits, L.A. Cellular sold telephones below cost. It lost money on telephone sales but made up for those losses with its increased sales of services. Plaintiffs are companies that sell cellular telephones but may not sell services. These companies claim that, because they are not allowed to sell services, they cannot fairly compete with L.A. Cellular's strategy of selling telephones below cost and recouping the losses with profits on the sales of services. The action requires us to interpret California's Unfair

Practices Act (Bus. & Prof. Code, § 17000 et seq.)[1] and unfair competition law (§ 17200 et seq.).[2]

We conclude that to violate sections 17043 and 17044, part of the Unfair Practices Act, which prohibit below-cost sales and loss leaders, a company must act with the purpose, i.e., the desire, of injuring competitors or destroying competition. We also conclude that, even if L.A. Cellular's actions lacked the purpose necessary to violate the Unfair Practices Act, they might be deemed unfair under the unfair competition law. We therefore agree with the Court of Appeal's conclusions and affirm its judgment.

## I. FACTUAL AND PROCEDURAL HISTORY

At the time relevant to this action,[3] the federal government licensed two companies to provide cellular telephone service in the Los Angeles area: L.A. Cellular and AirTouch Cellular. In addition to cellular service, L.A. Cellular sells cellular telephones. Plaintiffs Cel-Tech Communications, Inc., Comtech, Inc., Cellular Service, Inc., and Nutek, Inc., sell cellular telephones. The Court of Appeal opinion described L.A. Cellular's activities challenged in this action. "The high price of cellular telephones was the primary obstacle to L.A. Cellular's obtaining new subscribers for its service. Sales of cellular telephones are very price sensitive and a purchase of cellular equipment is usually accompanied by a service activation or subscription to cellular service. Consequently, in the early 1990's, L.A. Cellular formulated a strategy of selling cellular telephones below cost in order to increase the number of subscribers to its cellular telephone service. L.A. Cellular estimated that each service activation was worth $1,500 to it. Thus, L.A. Cellular's multimillion-dollar losses on cellular telephone equipment sales were easily offset by its profits on cellular service."

Plaintiffs sued L.A. Cellular, alleging that its below-cost telephone sales practice harmed them. It alleged several causes of action including, as relevant here, that L.A. Cellular violated the Unfair Practices Act and the unfair competition law. The action under the Unfair Practices Act alleged

---

[1]All further statutory citations are to the Business and Professions Code unless otherwise indicated.

[2]The Legislature has given section 17200 et seq. no official name. Accordingly, we are now using the label "unfair competition law." (*Stop Youth Addiction, Inc.* v. *Lucky Stores, Inc.* (1998) 17 Cal.4th 553, 558, fn. 2 [71 Cal.Rptr.2d 731, 950 P.2d 1086].)

[3]The situation may have changed somewhat in the meantime. "Competition in the cellular service market, which now consists of two regulated facilities-based carriers in each cellular market, will be expanded in many areas with the entry of an unregulated system . . . ." (*Re Regulation of Cellular Radiotelephone Utilities* (1995) 59 Cal.P.U.C.2d 192, 203.) This opinion concerns only the facts reflected in the record and not possible recent developments.

L.A. Cellular had unlawfully engaged in below-cost sales (§ 17043) and used loss leaders (§ 17044). The matter was tried before the court. At the end of plaintiffs' case-in-chief, and before the defense presented evidence, the court granted L.A. Cellular's motion for judgment under Code of Civil Procedure section 631.8. It issued an extensive statement of decision. On the cause of action under the Unfair Practices Act, the court found that L.A. Cellular did engage in below-cost sales and used loss leaders, and that it thereby harmed plaintiffs. It found, however, that L.A. Cellular did not violate the Unfair Practices Act because it intended merely to compete with AirTouch Cellular, not to harm the plaintiffs. It also ruled that the action under the unfair competition law necessarily failed along with the other causes of action. Plaintiffs appealed.

The Court of Appeal reversed as to the cause of action under the unfair competition law and affirmed the judgment as to the other causes of action. It held that L.A. Cellular proved it did not have an "injurious intent," and hence its actions did not violate sections 17043 and 17044 of the Unfair Practices Act. It also held that L.A. Cellular's actions might nevertheless have violated the unfair competition law and remanded the matter for retrial on that cause of action. Plaintiffs petitioned for review of the holding regarding the Unfair Practices Act, and L.A. Cellular petitioned for review of the holding regarding the unfair competition law. We granted both petitions.

## II. Discussion

Preliminarily, we note that some amici curiae have suggested that this action might infringe on the regulatory authority of the Public Utilities Commission (PUC). (See generally, *San Diego Gas & Electric Co.* v. *Superior Court* (1996) 13 Cal.4th 893, 918 [55 Cal.Rptr.2d 724, 920 P.2d 669]; *Farmers Ins. Exchange* v. *Superior Court* (1992) 2 Cal.4th 377, 390-392 [6 Cal.Rptr.2d 487, 826 P.2d 730].) The Court of Appeal invited the PUC to file an amicus curiae brief addressing this question. That brief concludes that it is unlikely this action will interfere with the PUC's regulatory responsibilities. Having considered the matter ourselves, we agree.

In 1995, the PUC issued an order largely rescinding prior prohibitions on the practice of "bundling," i.e., "packaging cellular telephone equipment with cellular service and discounting the price of the package." (*Re Regulation of Cellular Radiotelephone Utilities, supra,* 59 Cal.P.U.C.2d at p. 196.) The PUC expressed concern that cellular equipment dealers "will be unable to continue to profitably compete if bundling is permitted because of below-cost equipment sales . . . ." (*Id.* at p. 206.) Despite this concern, it chose to

permit bundling, but stressed that "California, similar to the other states, has laws which restrict the practice of below-cost pricing (e.g., [Bus. & Prof.] Code § 17043). Any bundling approval on our part must not violate or encourage any violation of below-cost pricing laws. California's prohibitions against below-cost pricing must be incorporated in any bundling authority that we may grant." (*Id.* at p. 205.) Because of these laws, the PUC said, "there is no basis to assume that below-cost pricing of equipment of the sort prohibited by [Business and Professions Code section] 17043 will occur." (*Id.* at p. 206.) Its order expressly permits bundling only if providers "conform to all applicable California and federal consumer protection and below-cost pricing laws." (*Id.* at p. 214.)

More recently, the PUC noted that the "court, not the [PUC], has jurisdiction to determine violations of antitrust laws," and that "[i]f an entity violates below-cost pricing law . . . , it is subject to the usual consequences for such violations. We note that while we would, of course, review a below-cost allegation brought before us in an appropriate proceeding, we are certainly not the primary enforcer of below-cost pricing law." (*Investigation on the Commission's Own Motion Into the Regulation of Cellular Radiotelephone Utilities* (1997) Cal.P.U.C. Dec. No. 97-02-053, pp. 18, 39 [1997 WL 129412].)

We conclude that we may decide this action without infringing on the PUC's authority.[4]

A. *Plaintiffs' Petition (Unfair Practices Act)*

Plaintiffs alleged defendant violated the Unfair Practices Act in two ways: (1) by selling below cost in violation of section 17043, and (2) by using loss leaders in violation of section 17044. Neither the trial court nor the Court of Appeal found any violation of either section because plaintiffs did not establish defendant acted with the necessary culpable mental state. Plaintiffs argue that the courts below misconstrued section 17043's mental state requirement, and that section 17044 does not require a culpable mental state.

1. *Below-cost Sales (§ 17043)*

Section 17043 provides: "It is unlawful for any person engaged in business within this State to sell any article or product at less than the cost

---

[4]In its amicus curiae brief, the PUC did express one "caveat": that a judicial decision prohibiting bundling would interfere with its jurisdiction. We need not decide this point, for the question of bundling is not before us. Like the Court of Appeal, we express no opinion regarding bundling.

thereof to such vendor, or to give away any article or product, *for the purpose of injuring competitors or destroying competition.*" (Italics added.) The Court of Appeal held that this provision requires "a *specific intent* to injure competitors or destroy competition." (Original italics.) It found that because L.A. Cellular's "intent was simply to compete with AirTouch for subscribers, and that the harm to plaintiffs was unintended," it did not violate section 17043.

Plaintiffs contend the defendant need not *desire* to injure competitors or destroy competition to violate section 17043; instead, "plaintiffs need only show the defendant believed or knew that harm was substantially certain to result, or that the manifest probability of harm was very great." California courts have not decided this precise question. The cases describing section 17043's mental state requirement have generally repeated the statutory language or loosely used the word "intent" without defining it. (E.g., *Wholesale T. Dealers* v. *National etc. Co.* (1938) 11 Cal.2d 634, 643 [82 P.2d 3, 118 A.L.R. 486] [quoting the statutory language]; *id.* at p. 658 [referring to the "intent" requirement].) No case has expressly considered whether the statute requires the desire to injure competitors or destroy competition or only knowledge that the injury or destruction will occur.

In some other contexts, courts have interpreted an intent requirement as plaintiffs urge. We have said that " 'intent,' in the law of torts, denotes not only those results the actor desires, but also those consequences which he knows are substantially certain to result from his conduct." (*Schroeder* v. *Auto Driveaway Co.* (1974) 11 Cal.3d 908, 922 [114 Cal.Rptr. 622, 523 P.2d 662].) *Schroeder* quoted Justice Oliver Wendell Holmes: " 'If the manifest probability of harm is very great, and the harm follows, we say that it is done maliciously or intentionally; if not so great, but still considerable, we say that the harm is done negligently; if there is no apparent danger, we call it mischance.' (Holmes, *Privilege, Malice and Intent* (1894) 8 Harv.L.Rev. 1.)" (*Id.* at p. 922, fn. 10; see also *Estate of Kramme* (1978) 20 Cal.3d 567, 572-573 [143 Cal.Rptr. 542, 573 P.2d 1369] ["While the word 'intentionally' has been variously defined depending on the context and intent of the Legislature [citation], this section specifies that a particular result, rather than a particular act, must have been intended. For a result to be caused 'intentionally,' the actor must either desire the result or know, to a substantial certainty, that the result will occur. [Citations.]" (Fn. omitted.)].)

If section 17043 used the word "intent" to describe the necessary mental state, plaintiffs' position might have merit. Section 17043, however, does not say "intent"; it says "purpose." "Intent" might be ambiguous; "purpose" is not.

"Purpose" has a precise meaning. As an illustration, we may turn to the Model Penal Code. In that code, the American Law Institute drafters defined four distinct culpable mental states. None of the definitions uses the ambiguous word "intent." The code's two highest mental states are to act "purposely" and to act "knowingly." (Model Pen. Code, § 2.02(1).) Persons act "purposely" with respect to a result if it is their "conscious object" to cause that result. (Model Pen. Code, § 2.02(2)(a)(i).) Persons act "knowingly" with respect to a result if they are "practically certain" their conduct will cause that result. (Model Pen. Code, § 2.02(2)(b)(ii).) The comment to the code explains the difference between purpose and knowledge. "In defining the kinds of culpability, the Code draws a narrow distinction between acting purposely and knowingly, *one of the elements of ambiguity in legal usage of the term 'intent.'*[5] Knowledge that the requisite external circumstances exist is a common element in both conceptions. But action is not purposive with respect to the nature or result of the actor's conduct unless it was his conscious object to perform an action of that nature or to cause such a result." (Model Pen. Code & Commentaries, com. 2 to § 2.02, p. 233, fn. omitted, italics added.) "The essence of the narrow distinction between these two culpability levels is the presence or absence of a *positive desire* to cause the result; purpose requires a culpability beyond the knowledge of a result's near certainty." (Robinson & Grall, *Element Analysis in Defining Criminal Liability: The Model Penal Code and Beyond* (1983) 35 Stan.L.Rev. 681, 694, original italics.)

We discuss the Model Penal Code and commentaries only because they focus on the difference between purpose and knowledge, the ambiguity of the word "intent," and the precise meaning of the word "purpose." Because the Model Penal Code was drafted after the Unfair Practices Act, the Legislature could not have considered the code in enacting the act. California has not adopted the Model Penal Code. But the American Law Institute did not modify the meaning of the word "purpose" or invent the ambiguity in the word "intent." Its discussion is instructive as to the correct interpretation of the word "purpose."

Plaintiffs cite for support the first Restatement of Torts, which was published near the time the Legislature enacted the Unfair Practices Act. That Restatement, however, also reflects the difference between purpose and knowledge, while recognizing that often knowledge alone is sufficient for

[5]The Model Penal Code itself resolves the ambiguity by defining " 'intentionally' or 'with intent' " as meaning "purposely." (Model Pen. Code, § 1.13(12).) Some of the states that have adopted that code's distinction between purpose and knowledge have used the word "intentionally" instead of "purposely" but have defined it to mean "conscious objective." (Model Pen. Code & Commentaries, com. 2 to § 2.02, p. 235, fn. 11.)

tort liability. Plaintiffs quote the first Restatement of Torts section 870: "A person who does any tortious act for the purpose of causing harm to another or to his things or to the pecuniary interests of another is liable to the other for such harm if it results . . . ." They further cite language in comment e to that section: "In many situations, an act done with the belief or knowledge that a result will happen has the same consequences as an act done for the purpose of causing the result." (Rest., Torts, § 870, com. e, p. 410.) That language states that a knowing act can cause harm as well as a purposeful act, but it clearly distinguishes between purpose and knowledge. The next sentence of that comment draws the same distinction: "Thus one who deceives another, knowing that a third person will be deceived by the misrepresentation, is liable to the third person as he would be if he acted for the purpose of deceiving the third person [citation]." (*Ibid.*) The same comment goes on to discuss when knowing but not purposeful acts might be insufficient to create tort liability.

Thus, the drafters of the first Restatement of Torts also understood the difference between purpose and knowledge, while they believed that often knowledge alone may be sufficient for liability. That understanding is reflected even more clearly elsewhere. Section 13 of that Restatement, defining battery, requires an "intention[al]" act. Comment d to that section defines an act as intentional if it is "done for the purpose of causing the contact or apprehension *or* with knowledge on the part of the actor that such *contact or apprehension is substantially certain to be produced.*" (Rest., Torts, § 13, com. d, p. 29, italics added.) Although the Restatement defines intent broadly as including both purpose and knowledge, it recognizes the narrow meaning of the word "purpose." The Restatement Second of Torts rewrote section 870 to refer to "intentionally" causing an injury, which is defined as including knowledge. (Rest.2d Torts, § 870, com. b, p. 280; see also *id.* at § 8 A, p. 15.) But comment b to section 870 also says, "In some cases in which the claim may be entirely novel the court may decide to limit the liability to the situation in which the defendant acted for the purpose of producing the harm involved." (Rest.2d Torts, § 870, com. b, p. 280.) Again, the Restatement shows an awareness of the precise meaning of the word "purpose."

We do not doubt that an actor who knows but does not desire that an act will cause a result might be deemed to intend that result, or that this intent or knowledge might be sufficient for some forms of tort liability. But these circumstances do not change the meaning of the word "purpose." We are interpreting a statute. Section 17043 uses the word "purpose," not "intent," not "knowledge." We therefore conclude that to violate section 17043, a

company must act with the purpose, i.e., the desire, of injuring competitors or destroying competition. As plaintiffs do not contend they have shown that L.A. Cellular acted with that purpose, the lower courts were correct in finding it did not violate that section.

### 2. *Loss Leaders (§ 17044)*

Section 17044 provides: "It is unlawful for any person engaged in business within this State to sell or use any article or product as a 'loss leader' as defined in Section 17030 of this chapter." Section 17030, in turn, defines "Loss leader" as "any article or product sold at less than cost: [¶] (a) Where the purpose is to induce, promote or encourage the purchase of other merchandise; or [¶] (b) Where the effect is a tendency or capacity to mislead or deceive purchasers or prospective purchasers; or [¶] (c) Where the effect is to divert trade from or otherwise injure competitors." On its face, this language does not appear to require any culpable mental state when subdivision (c) applies. Plaintiffs argue that section 17044 prohibits use of loss leaders any time the effect is to divert trade from or otherwise injure competitors, and that they need not show defendant had any particular mental state.

Whatever merit the argument might have in the abstract, we are not deciding a question of first impression. Beginning in 1952, California courts have interpreted section 17044 as containing the same mental state requirement as section 17043. "While section 17044 of the act provides that the practice of using any article or product as a 'loss leader' is included among the prohibitions of the chapter, we conclude it was the intent of the Legislature to make it unlawful to sell articles below cost for the purpose of injuring competitors or destroying competition and that to be unlawful, 'loss leader' sales must be made for that purpose." (*Ellis* v. *Dallas* (1952) 113 Cal.App.2d 234, 239 [248 P.2d 63].)

This holding was reaffirmed in *Dooley's Hardware Mart* v. *Food Giant Markets, Inc.* (1971) 21 Cal.App.3d 513 [98 Cal.Rptr. 543]. There the plaintiff, like plaintiffs here, argued that section 17044 does not have an "intent" requirement "because there is no mention of it in either section 17044 or section 17030, the two sections directly and immediately applicable." (*Dooley's Hardware Mart* v. *Food Giant Markets, Inc., supra*, 21 Cal.App.3d at p. 516.) They further argued that a 1953 amendment to section

17044 changed the result of *Ellis* v. *Dallas*, *supra*, 113 Cal.App.2d 234.[6] The court disagreed: "We have examined the 1953 rewrite of the section and cannot find any basis for attributing the change in meaning urged by [plaintiff]. Furthermore we have also examined the legislative history of the 1953 bill ([Sen. Bill No.] 881) and found that it was enacted in exactly the same form as it was introduced. Finally, both sections 17071 and 17071.5, creating rebuttable presumptions of the requisite wrongful intent, apply expressly, without excepting section 17044, to *all* actions brought under the Act. The latter of these sections was enacted in 1961, some nine years after the *Ellis* decision. (Stats. 1961, ch. 1347, § 1, p. 3125.) It seems clear to us that the *Ellis* decision is still the governing law on this point in view of the failure of the Legislature to nullify by appropriate amendment the *Ellis* interpretation of section 17044 (see *Bishop* v. *City of San Jose* [(1969)] 1 Cal.3d 56, 65 [81 Cal.Rptr. 465, 460 P.2d 137]) and that therefore, notwithstanding the absence of any language to this effect in either section 17044 or section 17030, intent to injure competitors or to destroy competition is required for violation of section 17044. In other words for competition to be unfair under the Act, the person engaging in the challenged practice must possess an intent to injure his competitors or destroy his competition. (See § 17001.)" (*Dooley's Hardware Mart* v. *Food Giant Markets, Inc.*, *supra*, 21 Cal.App.3d at pp. 516-517, original italics, fn. omitted.)

Two subsequent appellate court decisions have reiterated that sections 17043 and 17044 contain identical "intent" requirements, although without independent analysis. (*Western Union Financial Services, Inc.* v. *First Data Corp.* (1993) 20 Cal.App.4th 1530, 1540, fn. 10 [25 Cal.Rptr.2d 341]; *Hladek* v. *City of Merced* (1977) 69 Cal.App.3d 585, 591 [138 Cal.Rptr. 194].)

Decisions from this court are inconclusive but tend to support the conclusion that both sections require the same mental state. Plaintiffs rely on the early decision of *People* v. *Pay Less Drug Store* (1944) 25 Cal.2d 108 [153 P.2d 9]. In that case, the trial court found that the defendants had sold certain "items below cost for the purpose of destroying the business of competitors . . . . The court also found that the defendants had sold certain articles as 'loss leaders.' " (*Id.* at p. 112.) We noted that "Section 3 of the Unfair Practices Act makes it unlawful to sell any article or product at less than cost as defined, for the purpose of injuring competitors or destroying competition," and that the "section also prohibits the sale of 'loss leaders,' as

---

[6]As originally enacted in 1941, section 17044 provided, "The practice of using any article or product as a 'loss leader' is included among the prohibitions of this chapter." (Stats. 1941, ch. 526, § 1, p. 1842.) The section was amended in 1953 to read as it now does. (Stats. 1953, ch. 334, § 1, p. 1601.) Section 17030 was enacted in 1941 with section 17044 and has not been amended since. (Stats. 1941, ch. 526, § 1, p. 1841.)

defined." (*Ibid.*) After discussing at length several contentions not relevant here, we disposed summarily of one contention using language plaintiffs cite: "The defendants contend that the provision defining 'loss leader' is indefinite in that it appears not to require the intent to injure competitors or destroy competition in all cases. Inasmuch as the judgment enjoined sales of articles as 'loss leaders' only when they diverted trade from or otherwise injured competitors, the defendants are not in a position to complain." (*Id.* at p. 117.) We read this language as only stating that the defendants before the court, who *had* acted purposely, were not in a position to complain about the statute's apparent lack of a mental requirement in other cases. Because the defendants had acted purposely, there was no need to decide the important issue presented here, involving defendants that do not act purposely.

A more recent decision also does not consider this question in detail, but supports the holding of *Ellis* v. *Dallas, supra,* 113 Cal.App.2d 234. In *Tri-Q, Inc.* v. *Sta-Hi Corp.* (1965) 63 Cal.2d 199, 203 [45 Cal.Rptr. 878, 404 P.2d 486], we adopted a portion of the Court of Appeal opinion, including that portion relevant here. In that case, the plaintiff claimed the defendant had violated sections 17043 and 17044. (*Tri-Q, Inc.* v. *Sta-Hi Corp., supra,* 63 Cal.2d at p. 203.) The trial court found the defendant had not sold its product at less than cost. The opinion upheld that factual finding but then said: "But even had the trial court found that the product had been sold below cost, there would still be the issue of whether the seller had so acted 'for the purpose of injuring competitors or destroying competition.' (Bus. & Prof. Code, § 17043; . . . *Ellis* v. *Dallas, supra,* 113 Cal.App.2d 234, 239.)" (*Id.* at p. 207.) The opinion noted that the trial court found, on sufficient evidence, that the defendant had no injurious intent, and, therefore, "it does not appear to be probable that a result more favorable to the plaintiff Tri-Q, Inc., would have been reached by the trial court even if it had found that such prices were less than the actual cost of the product." (*Id.* at p. 209.) This language apparently applied to both the sections 17044 and 17043 claims.

Although we did not expressly discuss whether section 17044 requires the same mental state as section 17043, this language in *Tri-Q, Inc.* v. *Sta-Hi Corp., supra,* 63 Cal.2d 199, and our citation to the very page of *Ellis* that decided the question (*Ellis* v. *Dallas, supra,* 113 Cal.App.2d at p. 239), shows we at least assumed both sections require the same mental state.

Plaintiffs argue the appellate court decisions were wrongly decided and we should overrule them. They also argue that *Tri-Q, Inc.* v. *Sta-Hi Corp., supra,* 63 Cal.2d 199, did not clearly decide the question. Additionally, they

note that we adopted the Court of Appeal opinion in that case, and claim that had the opinion decided this issue, it would merely have been another of the "erroneous court of appeal decisions" we should overrule. We disagree with the latter point. We expressly "adopt[ed]" the Court of Appeal opinion "as our opinion," which we do occasionally. (*Id.* at p. 203; e.g., *Arriaga* v. *County of Alameda* (1995) 9 Cal.4th 1055, 1059 [40 Cal.Rptr.2d 116, 892 P.2d 150].) The fact that we adopted a Court of Appeal opinion rather than drafted our own does not reduce its precedential value. When we "adopt" an opinion in this fashion, we do, indeed, make it "our opinion." We agree, however, that *Tri-Q, Inc.* v. *Sta-Hi Corp.*, *supra*, 63 Cal.2d 199, did not itself definitively resolve this question. We considered it only by implication and did not expressly discuss it. The opinion does, however, support the unbroken line of appellate court decisions that did decide the question.

We thus see that, for almost half a century, California courts have unanimously interpreted section 17044 to require the same mental state as section 17043. Although we have never explicitly considered the question, we assumed that interpretation was correct in a decision that is itself over three decades old. During that time, the Legislature has amended California's statutes regulating competition numerous times, sometimes to overrule judicial interpretations. (See *Stop Youth Addiction, Inc.* v. *Lucky Stores, Inc.*, *supra*, 17 Cal.4th at pp. 569-570.) But it has left this rule intact. Legislative inaction is often not a convincing reason to refuse to change a statutory interpretation. (E.g., *Ventura County Deputy Sheriffs' Assn.* v. *Board of Retirement* (1997) 16 Cal.4th 483, 506 [66 Cal.Rptr.2d 304, 940 P.2d 891].) Under the circumstances here, however, including the longevity of the rule and the unanimity of the decisions stating it, we believe it is up to the Legislature to change it if it is to be changed. In *Dooley's Hardware Mart* v. *Food Giant Markets, Inc.*, *supra*, 21 Cal.App.3d at pages 516-517, the court reaffirmed the holding of *Ellis* v. *Dallas*, *supra*, 113 Cal.App.2d 234, partly because of legislative inaction in the intervening two decades. That rationale is even stronger today, yet another quarter of a century later. Section 17044 has a long-settled meaning. We should not at this late date find it requires no culpable mental state after 50 years of contrary judicial interpretation. We decline plaintiffs' request to overrule that interpretation.

Accordingly, the lower courts were correct that plaintiffs' action under section 17044 fails for the same reason their action under section 17043 fails—they did not prove defendant acted with the necessary purpose.

B.  *Defendant's Petition (Unfair Competition Law)*

The Court of Appeal held that even though, when L.A. Cellular sold telephones below cost, it lacked the purpose necessary to violate the Unfair

Practices Act, its acts might nevertheless be deemed unfair under the unfair competition law. L.A. Cellular argues that its conduct "is both governed by and lawful under the express provisions of the Unfair Practices Act," and that what is lawful under that act cannot violate the unfair competition law. Plaintiffs counter that L.A. Cellular's actions were not unfair "simply because it was selling below cost. Rather, what made L.A. Cellular's actions unfair in this instance was that it subsidized massive sales below cost with duopoly profits that it knew were by law unavailable to its competitors."

### 1. *General Principles*

The purpose of the Unfair Practices Act is "to safeguard the public against the creation or perpetuation of monopolies and to foster and encourage competition, by prohibiting unfair, dishonest, deceptive, destructive, fraudulent and discriminatory practices by which fair and honest competition is destroyed or prevented." (§ 17001.) It prohibits specific "practices which the legislature has determined constitute unfair trade practices." (*Wholesale T. Dealers* v. *National etc. Co.*, *supra*, 11 Cal.2d at p. 643.) The prohibitions against purposeful below-cost sales and loss leaders (§§ 17043, 17044) are two examples. The consequences of violating the Unfair Practices Act can be quite severe. A prevailing plaintiff may receive treble damages and attorney fees. (§ 17082.) The act even provides criminal sanctions. Any person who violates the act is guilty of a misdemeanor punishable by up to a $1,000 fine and six months' imprisonment. (§ 17100.) This severity might explain why the Legislature applied these sanctions to below-cost sales and loss leaders only when done with the *purpose* of injuring competitors or destroying competition.[7]

The unfair competition law is independent of the Unfair Practices Act and other laws. Its remedies are "cumulative . . . to the remedies or penalties available under all other laws of this state" (§ 17205), but its sanctions are less severe than those of the Unfair Practices Act. Prevailing plaintiffs are generally limited to injunctive relief and restitution. (§ 17203; see *ABC Internat. Traders, Inc.* v. *Matsushita Electric Corp.* (1997) 14 Cal.4th 1247, 1268 [61 Cal.Rptr.2d 112, 931 P.2d 290].) Plaintiffs may not receive damages, much less *treble* damages, or attorney fees. (*Bank of the West* v. *Superior Court* (1992) 2 Cal.4th 1254, 1266 [10 Cal.Rptr.2d 538, 833 P.2d 545]; *Consumers Union of United States, Inc.* v. *Fisher Development, Inc.* (1989) 208 Cal.App.3d 1433, 1443 [257 Cal.Rptr. 151].) The law provides for civil penalties (e.g., § 17206) but contains no criminal provisions.

---

[7] Justice Baxter would essentially read the word "purpose" out of section 17043 and subject L.A. Cellular to potential treble damages, attorney fees, and even criminal sanctions for nonpurposeful conduct despite the statutory language. We decline to do so.

■ In contrast to its limited remedies, the unfair competition law's scope is broad. Unlike the Unfair Practices Act, it does not proscribe specific practices. Rather, as relevant here, it defines "unfair competition" to include "any unlawful, unfair or fraudulent business act or practice." (§ 17200.)[8] Its coverage is "sweeping, embracing ' "anything that can properly be called a business practice and that at the same time is forbidden by law." ' " (*Rubin* v. *Green* (1993) 4 Cal.4th 1187, 1200 [17 Cal.Rptr.2d 828, 847 P.2d 1044], quoting *Barquis* v. *Merchants Collection Assn.* (1972) 7 Cal.3d 94, 113 [101 Cal.Rptr. 745, 496 P.2d 817].) It governs "anti-competitive business practices" as well as injuries to consumers, and has as a major purpose "the preservation of fair business competition." (*Barquis* v. *Merchants Collection Assn.*, *supra*, 7 Cal.3d at p. 110; see also *People* v. *McKale* (1979) 25 Cal.3d 626, 631-632 [159 Cal.Rptr. 811, 602 P.2d 731]; *People* ex rel. *Mosk* v. *National Research Co. of Cal.* (1962) 201 Cal.App.2d 765, 771 [20 Cal.Rptr. 516].) By proscribing "any unlawful" business practice, "section 17200 'borrows' violations of other laws and treats them as unlawful practices" that the unfair competition law makes independently actionable. (*State Farm Fire & Casualty Co.* v. *Superior Court* (1996) 45 Cal.App.4th 1093, 1103 [53 Cal.Rptr.2d 229], citing *Farmers Ins. Exchange* v. *Superior Court*, *supra*, 2 Cal.4th at p. 383.)

However, the law does more than just borrow. The statutory language referring to "any unlawful, unfair *or* fraudulent" practice (italics added) makes clear that a practice may be deemed unfair even if not specifically proscribed by some other law. "Because Business and Professions Code section 17200 is written in the disjunctive, it establishes three varieties of unfair competition—acts or practices which are unlawful, or unfair, or fraudulent. 'In other words, a practice is prohibited as "unfair" or "deceptive" even if not "unlawful" and vice versa.' " (*Podolsky* v. *First Healthcare Corp.* (1996) 50 Cal.App.4th 632, 647 [58 Cal.Rptr.2d 89], quoting *State Farm Fire & Casualty Co.* v. *Superior Court*, *supra*, 45 Cal.App.4th at p. 1102.) The case of *Motors, Inc.* v. *Times Mirror Co.* (1980) 102 Cal.App.3d 735 [162 Cal.Rptr. 543] is an example of the unfair competition law's independent force. There, the plaintiff challenged a newspaper's two-tiered advertising rate structure. The Court of Appeal held that the plaintiff stated a valid cause of action under the unfair competition law even though the Unfair Practices Act did not itself prohibit the pricing policy at issue. (*Motors, Inc.* v. *Times Mirror Co.*, *supra*, 102 Cal.App.3d at p. 741 [citing

---

[8]In its entirety, section 17200 provides: "As used in this chapter, unfair competition shall mean and include any unlawful, unfair or fraudulent business act or practice and unfair, deceptive, untrue or misleading advertising and any act prohibited by Chapter 1 (commencing with Section 17500) of Part 3 of Division 7 of the Business and Professions Code [which involves advertising]."

§ 17042, which states that nothing in the Unfair Practices Act "prohibits" certain price differentials].)

The unfair competition law, which has lesser sanctions than the Unfair Practices Act, has a broader scope for a reason. "[T]he Legislature . . . intended by this sweeping language to permit tribunals to enjoin on-going wrongful business conduct in whatever context such activity might occur. Indeed, . . . the section was intentionally framed in its broad, sweeping language, precisely to enable judicial tribunals to deal with the innumerable ' "new schemes which the fertility of man's invention would contrive." ' (*American Philatelic Soc.* v. *Claibourne* (1935) 3 Cal.2d 689, 698 [46 P.2d 135].) As the *Claibourne* court observed: 'When a scheme is evolved which on its face violates the fundamental rules of honesty and fair dealing, a court of equity is not impotent to frustrate its consummation because the scheme is an original one. . . .' (3 Cal.2d at pp. 698-699 . . . ; accord, *FTC* v. *The Sperry & Hutchinson Co.* (1972) 405 U.S. 233, 240 [31 L.Ed.2d 170, 177, 92 S.Ct. 898].) With respect to 'unlawful' or 'unfair' business practices, [former] section 3369 [today section 17200] specifically grants our courts that power. [¶] In permitting the restraining of all 'unfair' business practices, [former] section 3369 [today section 17200] undeniably establishes only a wide standard to guide courts of equity; as noted above, given the creative nature of the scheming mind, the Legislature evidently concluded that a less inclusive standard would not be adequate." (*Barquis* v. *Merchants Collection Assn.*, *supra*, 7 Cal.3d at pp. 111-112, fn. omitted.) "[I]t would be impossible to draft in advance detailed plans and specifications of all acts and conduct to be prohibited [citations], since unfair or fraudulent business practices may run the gamut of human ingenuity and chicanery." (*People* ex rel. *Mosk* v. *National Research Co. of Cal.*, *supra*, 201 Cal.App.2d at p. 772.)[9]

---

[9]Apparently taking her cue from the brief of amicus curiae American Council of Life Insurance, Justice Kennard asserts the unfair competition law did nothing more than codify the common law. (Conc. & dis. opn. of Kennard, J., *post*, at p. 194.) (Even L.A. Cellular does not make such a sweeping argument.) She relies primarily on *International etc. Workers* v. *Landowitz* (1942) 20 Cal.2d 418 [126 P.2d 609]. (Conc. & dis. opn. of Kennard, J., *post*, at pp. 194, 196, 197, 200.) That decision does, indeed, contain some language supporting her position. However, in *Barquis* v. *Merchants Collection Assn.*, *supra*, 7 Cal.3d at page 109, we unanimously concluded "that 'unfair competition' as used in the section cannot be equated with the common law definition of 'unfair competition,' but instead specifies that, for the purposes of its provisions, unfair competition 'shall mean and include *unlawful, unfair* or fraudulent business practice . . . .' (Italics added.)" Regarding the language Justice Kennard cites, we stated, "Although the *Landowitz* opinion does contain some language which may be read to limit [Civil Code former] section 3369 [the original unfair competition law] to common law 'unfair competition,' subsequent cases . . . have not confined the section so narrowly; in view of the factual context of *Landowitz*, such language was not crucial to the decision." (*Id.* at pp. 111-112, fn. 12; see also *Rubin* v. *Green*, *supra*, 4 Cal.4th at p. 1200 ["to

■ Although the unfair competition law's scope is sweeping, it is not unlimited. Courts may not simply impose their own notions of the day as to what is fair or unfair. Specific legislation may limit the judiciary's power to declare conduct unfair. If the Legislature has permitted certain conduct or considered a situation and concluded no action should lie, courts may not override that determination. When specific legislation provides a "safe harbor," plaintiffs may not use the general unfair competition law to assault that harbor.

*Rubin* v. *Green, supra,* 4 Cal.4th 1187, illustrates this principle. In that case, the plaintiff relied on the unfair competition law to pursue an action that the litigation privilege of Civil Code section 47, subdivision (b), otherwise prohibited. We "rejected the claim that a plaintiff may, in effect, 'plead around' absolute barriers to relief by relabeling the nature of the action as one brought under the unfair competition statute." (*Rubin* v. *Green, supra,* 4 Cal.4th at p. 1201.) A bar against an action "may not be circumvented by recasting the action as one under Business and Professions Code section 17200." (*Id.* at p. 1202.) We found "the conduct of defendants alleged in the complaint" came "within the scope of [Civil Code] section 47(b)," and thus was "absolutely immune from civil tort liability . . . . To permit the same . . . acts to be the subject of an injunctive relief proceeding brought by this same plaintiff under the unfair competition statute undermines that immunity. If the policies underlying section 47(b) are sufficiently strong to support an absolute privilege, the resulting immunity should not evaporate merely because the plaintiff discovers a conveniently different label for pleading what is in substance an identical grievance arising from identical conduct as that protected by section 47(b)." (*Id.* at pp. 1202-1203.)

A plaintiff may thus not "plead around" an "absolute bar to relief" simply "by recasting the cause of action as one for unfair competition." (*Manufacturers Life Ins. Co.* v. *Superior Court* (1995) 10 Cal.4th 257, 283 [41 Cal.Rptr.2d 220, 895 P.2d 56].) The rule does not, however, prohibit an action under the unfair competition law merely because some other statute

state a claim under the act one need not plead and prove the elements of a tort"]; *Bank of the West* v. *Superior Court, supra,* 2 Cal.4th at p. 1264 ["the statutory definition of 'unfair competition' 'cannot be equated with the common law definition . . . .' "]; *Motors, Inc.* v. *Times Mirror Co., supra,* 102 Cal.App.3d 735 [discussed in the text].)

A year after the decision in *People* ex rel. *Mosk* v. *National Research Co. of Cal., supra,* 210 Cal.App.2d 765, again about three months after the decision in *Barquis* v. *Merchants Collection Assn., supra,* 7 Cal.3d 94, and on occasion since, the Legislature amended the unfair competition law. On these occasions, rather than overrule these cases or *Motors, Inc.* v. *Times Mirror Co., supra,* 102 Cal.App.3d 735, the Legislature *expanded* the law's coverage. (Stats. 1963, ch. 1606, § 1, p. 3184; Stats. 1972, ch. 1084, § 1, pp. 2020-2021; see *Stop Youth Addiction, Inc.* v. *Lucky Stores, Inc., supra,* 17 Cal.4th at pp. 569-570.)

on the subject does not, itself, provide for the action or prohibit the challenged conduct. To forestall an action under the unfair competition law, another provision must actually "bar" the action or clearly permit the conduct. There is a difference between (1) not making an activity unlawful, and (2) making that activity lawful. For example, Penal Code section 211, which defines robbery, does not make murder unlawful. Most assuredly, however, that section does not also make murder lawful. Acts that the Legislature has determined to be lawful may not form the basis for an action under the unfair competition law, but acts may, if otherwise unfair, be challenged under the unfair competition law even if the Legislature failed to proscribe them in some other provision.

This conclusion is consistent with the overall pattern of the Unfair Practices Act and the unfair competition law. As discussed above, the Unfair Practices Act condemns specific conduct. The unfair competition law is less specific, because the Legislature cannot anticipate all possible forms in which unfairness might occur. If, in the Unfair Practices Act (or some other provision), the Legislature considered certain activity in certain circumstances and determined it to be lawful, courts may not override that determination under the guise of the unfair competition law. However, if the Legislature did not consider that activity in those circumstances, the failure to proscribe it in a specific provision does not prevent a judicial determination that it is unfair under the unfair competition law.

L.A. Cellular argues that the decision of *Motors, Inc.* v. *Times Mirror Co.*, *supra*, 102 Cal.App.3d 735, and the Court of Appeal decision in this case are inconsistent with another Court of Appeal decision, *Hobby Industry Assn. of America, Inc.* v. *Younger* (1980) 101 Cal.App.3d 358 [161 Cal.Rptr. 601] (*Hobby Industry*). We believe, however, that these cases can be mutually reconciled, and that all are consistent with the general framework of the unfair competition laws. *Hobby Industry* involved the Fair Packaging and Labeling Act (§ 12601 et seq.), which generally provides immunity to wholesalers and retailers. (*Hobby Industry, supra*, 101 Cal.App.3d at p. 369.) The Attorney General argued that, despite this immunity, "suits may be brought against [wholesalers and retailers] under the unfair competition statutes . . . ." (*Ibid.*) The court disagreed, finding "nothing in section 17200 et seq. which reimposes the liability on wholesalers and retailers which is expressly excluded by section 12602. . . . Although the Supreme Court has construed the orbit of the unfair competition statutes expansively (*People* v. *McKale* (1979) 25 Cal.3d 626, 631-632 [159 Cal.Rptr. 811, 602 P.2d 731], and *Barquis* v. *Merchants Collection Assn.* (1972) 7 Cal.3d 94, 111-113 [101 Cal.Rptr. 745, 496 P.2d 817]), it cannot be said that this

embracing purview also encompasses business practices which the Legislature has expressly declared to be lawful in other legislation. (See *Barquis, supra,* 7 Cal.3d 94, 111, fn. 12.)" (*Id.* at pp. 369-370.) We express no opinion on whether the specific holdings of *Motors, Inc.* v. *Times Mirror Co., supra,* 102 Cal.App.3d 735, and *Hobby Industry, supra,* 101 Cal.App.3d 358, were correct. However, we agree with *Motors, Inc.,* that a court may find certain activities unfair under the unfair competition law even though the Unfair Practices Act does not prohibit them. We also agree with *Hobby Industry* that the unfair competition law does not permit an action that another statute expressly precludes.

We thus conclude that a plaintiff may not bring an action under the unfair competition law if some other provision bars it. That other provision must actually bar it, however, and not merely fail to allow it. In other words, courts may not use the unfair competition law to condemn actions the Legislature permits. Conversely, the Legislature's mere failure to prohibit an activity does not prevent a court from finding it unfair. Plaintiffs may not "plead around" a "safe harbor," but the safety must be more than the absence of danger.[10]

■ If no statute provides a safe harbor, a court must determine whether the challenged conduct is unfair within the meaning of the unfair competition law. In doing so, courts may not apply purely subjective notions of fairness. "The appellate courts have 'neither the power nor the duty to determine the wisdom of any economic policy; that function rests solely with the legislature. . . .' (*Max Factor & Co.* v. *Kunsman* (1936) 5 Cal.2d 446, 454 [55 P.2d 177] .)" (*Wolfe* v. *State Farm Fire & Casualty Ins. Co.* (1996) 46 Cal.App.4th 554, 562 [53 Cal.Rptr.2d 878].) This court has not yet defined "unfair" under this law. A few Courts of Appeal have attempted a definition. (E.g., *People* v. *Casa Blanca Convalescent Homes, Inc.* (1984) 159 Cal.App.3d 509, 530 [206 Cal.Rptr. 164, 53 A.L.R.4th 661] ["[A]n 'unfair' business practice occurs when it offends an established public policy or when the practice is immoral, unethical, oppressive, unscrupulous or substantially injurious to consumers."]; *State Farm Fire & Casualty Co.* v. *Superior Court, supra,* 45 Cal.App.4th at p. 1104 [" 'the court must weigh the utility of the defendant's conduct against the gravity of the harm to the alleged victim' "].)

---

[10]L.A. Cellular also relies on *Perdue* v. *Crocker National Bank* (1985) 38 Cal.3d 913 [216 Cal.Rptr. 345, 702 P.2d 503] and *Blank* v. *Kirwan* (1985) 39 Cal.3d 311 [216 Cal.Rptr. 718, 703 P.2d 58]. Those cases have no bearing on this issue. We held in each that the plaintiff's allegations—entirely different from the allegations here—did not state a cause of action under the unfair competition law or some other law. In neither case did we suggest an action under the unfair competition law is precluded merely because some other statute does not provide for that action.

We believe these definitions are too amorphous and provide too little guidance to courts and businesses. Vague references to "public policy," for example, provide little real guidance. " '[P]ublic policy' as a concept is notoriously resistant to precise definition, and . . . courts should venture into this area, if at all, with great care and due deference to the judgment of the legislative branch, 'lest they mistake their own predilections for public policy which deserves recognition at law.' " (*Gantt* v. *Sentry Insurance* (1992) 1 Cal.4th 1083, 1095 [4 Cal.Rptr.2d 874, 824 P.2d 680].) These concerns led us to hold that to establish the tort of wrongful discharge in violation of public policy, the public policy triggering the violation must be tethered to a constitutional or statutory provision (*ibid.*) or a regulation carrying out statutory policy (*Green* v. *Ralee Engineering Co.* (1998) 19 Cal.4th 66, 90 [78 Cal.Rptr.2d 16, 960 P.2d 1046]).

L.A. Cellular and supporting amici curiae emphasize the need for California businesses to know, to a reasonable certainty, what conduct California law prohibits and what it permits. We sympathize with this concern. An undefined standard of what is "unfair" fails to give businesses adequate guidelines as to what conduct may be challenged and thus enjoined and may sanction arbitrary or unpredictable decisions about what is fair or unfair. In some cases, it may even lead to the enjoining of *pro*competitive conduct and thereby undermine consumer protection, the primary purpose of the antitrust laws. "Because ours is a culture firmly wedded to the social rewards of commercial contests, the law usually takes care to draw lines of legal liability in a way that maximizes areas of competition free of legal penalties." (*Della Penna* v. *Toyota Motor Sales, U.S.A., Inc.* (1995) 11 Cal.4th 376, 392 [45 Cal.Rptr.2d 436, 902 P.2d 740].) Courts must be careful not to make economic decisions or prevent rigorous, but fair, competitive strategies that all companies are free to meet or counter with their own strategies. Companies that cannot compete with others that are more capable or efficient may lawfully fail.

Accordingly, we believe we must devise a more precise test for determining what is unfair under the unfair competition law. To do so, we may turn for guidance to the jurisprudence arising under the "parallel" (*Barquis* v. *Merchants Collection Assn.*, *supra*, 7 Cal.3d at p. 110) section 5 of the Federal Trade Commission Act (15 U.S.C. § 45(a)) (section 5). "In view of the similarity of language and obvious identity of purpose of the two statutes, decisions of the federal court on the subject are more than ordinarily persuasive." (*People* ex rel. *Mosk* v. *National Research Co. of Cal.*, *supra*, 201 Cal.App.2d at p. 773; see also *Bank of the West* v. *Superior Court*, *supra*, 2 Cal.4th at pp. 1263-1264.) Admittedly, the two statutes are enforced in

significantly different ways. California has no administrative agency equivalent to the Federal Trade Commission (FTC), and private citizens have no right to seek personal enforcement of section 5 in lieu of FTC action. Nevertheless, California courts remain the ultimate arbiters of the meaning and scope of the unfair competition law, just as the federal courts are the ultimate arbiters of the meaning and scope of section 5 and the FTC's authority under it. As the issue before us in this case arises out of a claim of unfair competition between direct competitors, the relevant jurisprudence would be that arising under section 5's prohibition against "unfair methods of competition."[11]

The United States Supreme Court has stressed that the " 'antitrust laws . . . were enacted for "the protection of *competition*, not *competitors*." ' " (*Cargill, Inc.* v. *Monfort of Colorado, Inc.* (1986) 479 U.S. 104, 115 [107 S.Ct. 484, 491-492, 93 L.Ed.2d 427], original italics.) They "do not require the courts to protect small businesses from the loss of profits due to continued competition, but only against the loss of profits from practices forbidden by the antitrust laws." (*Id.* at p. 116 [107 S.Ct. at p. 492].) Injury to a competitor is not equivalent to injury to competition; only the latter is the proper focus of antitrust laws. (See *Atlantic Richfield Co.* v. *USA Petroleum Co.* (1990) 495 U.S. 328, 344 [110 S.Ct. 1884, 1894-1895, 109 L.Ed.2d 333]; *Brunswick Corp.* v. *Pueblo Bowl-O-Mat, Inc.* (1977) 429 U.S. 477, 488-489 [97 S.Ct. 690, 697-698, 50 L.Ed.2d 701]; § 17001 [the purpose of the antitrust law is "to foster and encourage competition" by prohibiting "practices by which fair and honest competition is destroyed or prevented"].) The high court has also found unfair practices that "conflict with the basic policies of [some other laws] even though such practices may not actually violate these laws" or amount to "trade restraints in their incipiency." (*FTC* v. *Brown Shoe Co.* (1966) 384 U.S. 316, 321, 322 [86 S.Ct. 1501, 1504, 16 L.Ed.2d 587], fn. omitted.)

These principles convince us that, to guide courts and the business community adequately and to promote consumer protection, we must require that any finding of unfairness to competitors under section 17200 be tethered to some legislatively declared policy or proof of some actual or threatened

---

[11]Section 5 contains two prohibitions: one against "unfair methods of competition" and the other against "unfair or deceptive acts or practices." The former generally governs injuries to competitors, the latter injuries to consumers as well as competitors. (*Barquis* v. *Merchants Collection Assn., supra,* 7 Cal.3d at pp. 109-110.) Our notice of federal law under section 5 means only that federal cases interpreting the prohibition against "unfair methods of competition" may assist us in determining whether a particular challenged act or practice is unfair under the test we adopt. We do not deem the federal cases controlling or determinative, merely persuasive.

impact on competition. We thus adopt the following test: When a plaintiff who claims to have suffered injury from a direct competitor's "unfair" act or practice invokes section 17200, the word "unfair" in that section means conduct that threatens an incipient violation of an antitrust law, or violates the policy or spirit of one of those laws because its effects are comparable to or the same as a violation of the law, or otherwise significantly threatens or harms competition.[12]

### 2. *Application to This Case*

Applying these principles to this case is a two-step process. First, we must determine whether the Legislature has provided a safe harbor for L.A. Cellular's conduct. Second, if it has not, we must determine whether that conduct is unfair as we have just defined it.

L.A. Cellular argues that sections 17043 and 17044 provide a safe harbor for all below-cost sales when the seller lacks the purpose of injuring competitors or destroying competition. We disagree. Although the Legislature limited the sanctions of treble damages, attorney fee awards, and criminal charges to *purposeful* below-cost sales, nothing in section 17043 or 17044 makes all other below-cost sales lawful, including those that have the effect, although not the purpose, of destroying competition. The Unfair Practices Act neither outlaws nor affirmatively permits all nonpurposeful below-cost sales. Accordingly, it does not preclude a court from deeming nonpurposeful conduct unfair under the unfair competition law.

This conclusion becomes clear when we consider another provision of the Unfair Practices Act that we believe *does* provide a safe harbor. Section 17026.1, subdivision (a)(2), enacted in 1992 and operative in 1994, provides: "Consistent with the provisions of subdivision (d) of Section 17050, providers of cellular services *shall be permitted* to sell cellular telephones below cost, provided that sales below cost are a good faith endeavor to meet the legal market prices of competitors in the same locality or trade area." (Italics

---

[12]This case involves an action by a competitor alleging anticompetitive practices. Our discussion and this test are limited to that context. Nothing we say relates to actions by consumers or by competitors alleging other kinds of violations of the unfair competition law such as "fraudulent" or "unlawful" business practices or "unfair, deceptive, untrue or misleading advertising." We also express no view on the application of federal cases such as *FTC v. Sperry & Hutchinson Co.* (1972) 405 U.S. 233 [92 S.Ct. 898, 31 L.Ed.2d 170] that involve injury to consumers and therefore do not relate to actions like this one.

Contrary to Justice Kennard's concurring and dissenting opinion, this test is not unduly uncertain. A body of law interpreting section 5 already exists. (See, e.g., Averitt, *The Meaning of "Unfair Methods of Competition" in Section 5 of the Federal Trade Commission Act* (1980) 21 B.C. L.Rev. 227.)

added.) Section 17050, subdivision (d), enacted in 1941, provides that the Unfair Practices Act's prohibitions against sales below cost and loss leaders do not apply to any sale made "[i]n an endeavor made in good faith *to meet* the legal prices of a competitor selling the same article or product, in the same locality or trade area and in the ordinary channels of trade." The italicized language of section 17026.1 shows the Legislature affirmatively permitted, i.e., made lawful, these good faith sales. If sections 17043 and 17044 had provided a safe harbor for *all* nonpurposeful below-cost sales, section 17026.1, subdivision (a)(2), would have been unnecessary.

L.A. Cellular argues, however, that because sections 17043 and 17044 deal with the same *subject* as this case—below-cost sales—and do not proscribe the conduct here, courts may not find it unfair. We are not persuaded. The practice challenged here resembles in some respects that condemned in sections 17043 and 17044, but differs in other ways. L.A. Cellular did not act with the purpose of injuring competitors or destroying competition. But it is a "duopolist," employing an overall strategy that might not be available to its nonduopolist competitors. As explained below, this circumstance is critical. The Legislature undoubtedly did not consider be-low-cost sales in this context. This may be one of the myriad unanticipated ways in which unfair competition may occur. The Legislature could not have anticipated this precise situation any more than it could "draft in advance detailed plans and specifications of all acts and conduct to be prohibited." (*People* ex rel. *Mosk* v. *National Research Co. of Cal., supra,* 201 Cal.App.2d at p. 772.) The originality of this practice does not place it beyond the reach of the unfair competition law.

We thus conclude that (1) good faith sales that section 17026.1 permits may not be deemed unfair under the unfair competition law; (2) below-cost sales and loss leaders under sections 17043 and 17044, the purpose of which is to injure competitors and destroy competition, are subject to the sanctions of the Unfair Practices Act; and (3) sales that come within neither the safe harbor of section 17026.1 nor the prohibitions of sections 17043 and 17044 may be considered unfair under the independent provisions of the unfair competition law as we have defined it. Accordingly, we agree with the Court of Appeal that the trial court erred in concluding that the unfair competition law cause of action necessarily failed when the other causes of action failed. Permitting this action under the unfair competition law does not allow plaintiffs to "plead around" an absolute bar of some other provision.

We now turn to the question whether the below-cost sales of this case are unfair under the test we have just stated. Because the trial court granted

judgment for L.A. Cellular before it presented any evidence, and the parties did not litigate the case with the particular test in mind, we cannot yet give a definitive answer. But we agree with the Court of Appeal that plaintiffs might be able to show the sales were unfair under this test. Pricing practices that have the *effect* of harming competition may be unfair even if done without the purpose necessary to violate the Unfair Practices Act.

■ Courts must be particularly cautious in evaluating claims that a competitor's prices are too low. Pricing practices are not unfair merely because a competitor may not be able to compete against them. Low prices often benefit consumers and may be the very essence of competition. "Low prices benefit consumers regardless of how those prices are set, and so long as they are above predatory levels, they do not threaten competition." (*Atlantic Richfield Co.* v. *USA Petroleum Co., supra,* 495 U.S. at p. 340 [110 S.Ct. at p. 1892].) Courts must not prohibit "vigorous competition" nor "render illegal any decision by a firm to cut prices in order to increase market share. The antitrust laws require no such perverse result, for '[i]t is in the interest of competition to permit dominant firms to engage in vigorous competition, including price competition.'" (*Cargill, Inc.* v. *Monfort of Colorado, Inc., supra,* 479 U.S. at p. 116 [107 S.Ct. at p. 492].)

■ The conduct challenged here, however, might be unfair. The PUC has indicated that the "cellular equipment market" is supposed to be openly "competitive," in contrast to the "cellular service market," which is not. (*Re Regulation of Cellular Radiotelephone Utilities, supra,* 59 Cal.P.U.C.2d at pp. 203, 206.) Indeed, it expressed concern that, if it permitted bundling, below-cost pricing by service providers might destroy competition for providing equipment. It permitted bundling only because it believed that "cellular dealers operate in a reasonably competitive market that will continue to exist even if bundling is authorized." (*Id.* at p. 206.)

The trial court will have to determine whether the challenged strategy met the test of unfairness we have articulated. This case has an unusual circumstance that might bring it within the unfair competition law's coverage: L.A. Cellular's position as a wholesale duopolist. On remand, the court might find that L.A. Cellular used this legally privileged status in violation of section 17200. "[F]air and honest competition" (§ 17001) in equipment sales might not be possible when a legally privileged company sells equipment below cost as a strategy to increase profits on service sales that are prohibited to its equipment competitors.

Allowing a company to sell telephones at a loss to increase profits on service sales, and to recoup its losses with those profits, might threaten the

ability of any company not permitted to sell services to compete in telephone sales. As the Court of Appeal explained, "It is L.A. Cellular's privileged status as one of two holders of a lucrative government-licensed duopoly which enabled L.A. Cellular to subsidize massive losses on below-cost sales of cellular equipment with its duopoly profits on cellular service, profits which by law were unavailable to its competitors. In this regard, the PUC itself has recognized 'the discounts on cellular equipment are supported by the high profits on cellular service, *profits which are in turn made possible by the duopoly market structure. . . .*' (*Re Regulation of Cellular Radiotelephone Utilities* (1995) 59 Cal.P.U.C.2d 192, 205, italics added [by the Court of Appeal].) Given L.A. Cellular's government-protected position in the duopoly service market, the fairness of its below-cost sales of cellular equipment requires careful scrutiny."

L.A. Cellular's desire to make telephone purchases attractive to consumers in order to increase its service sales may be legitimate. If its pricing strategy is found unfair as we have defined it, it might still seek to gain customers in other ways, but it may not destroy the competitiveness of the telephone market. Accordingly, we agree with the Court of Appeal that this action must be remanded for retrial on the unfair competition law cause of action. Because we have stated the applicable test for the first time, we think plaintiffs should be allowed to present additional evidence to meet that test if they choose. Defendant may also, of course, present a defense. (*Pinsker* v. *Pacific Coast Soc. of Orthodontists* (1969) 1 Cal.3d 160, 167 [81 Cal.Rptr. 623, 460 P.2d 495].)[13]

As we have noted, section 17026.1, which permits the sale of telephones below cost in "a good faith endeavor to meet the *legal* market prices of competitors in the same locality or trade area" (italics added), provides a safe harbor for those good faith sales. In light of its ruling on the Unfair Practices Act cause of action, the trial court expressly did not "reach[]" the question "whether L.A. Cellular in setting its prices in this manner fell within" this provision. It will have to do so on remand in determining whether L.A. Cellular violated the unfair competition law and, if it determines L.A. Cellular did, in fashioning a remedy. The court must not limit L.A. Cellular's actions in such a way as to make it unable to compete with its service rival. Section 17026.1, however, refers to a competitor's "legal"

---

[13]Justices Kennard and Baxter have differing interpretations of the facts. The trial court concluded that, because L.A. Cellular did not violate the Unfair Practices Act, it did not violate the unfair competition law; therefore, it never considered the facts in light of the test we have stated. We think it best for the trial court to do so on remand in the first instance. We also express no opinion on the correct remedy should the trial court find L.A. Cellular violated the unfair competition law.

prices. The trial court should bear in mind that the two duopolists may compete against each other directly for sales of services, and they should not be allowed to engage in unfair, and hence *illegal,* below-cost equipment sales together any more than either may separately. (*Page* v. *Bakersfield Uniform etc. Co.* (1966) 239 Cal.App.2d 762, 770-771 [49 Cal.Rptr. 46]; *People* v. *Gordon* (1951) 105 Cal.App.2d 711, 724 [234 P.2d 287].)

In its briefing in this court, L.A. Cellular assures us that it "and AirTouch compete vigorously in the service market . . . ." The court on remand should do nothing to hamper this competition for services. As the Court of Appeal noted, the PUC "has expressed a preference for 'healthy and direct [price] competition for cellular service' . . . ." (Quoting *Re Regulation of Cellular Radiotelephone Utilities, supra,* 59 Cal.P.U.C.2d at p. 205.)

### III. CONCLUSION

The judgment of the Court of Appeal is affirmed. The unfair competition law cause of action shall be retried consistently with the legal principles stated in this opinion.

George, C. J., Mosk, J. Brown, J., and Dibiaso, J.,* concurred.

**KENNARD, J.,** Concurring and Dissenting.—Plaintiffs, a group of cellular telephone and cellular service retailers, sued defendant Los Angeles Cellular Telephone Company. (L.A. Cellular), alleging that defendant's practice of selling cellular telephones below cost violated the unfair competition law (Bus. & Prof. Code, § 17200 et seq.), the Unfair Practices Act (Bus. & Prof. Code, §§ 17043, 17044), and, not at issue before this court, the Cartwright Act antitrust law (Bus. & Prof. Code, § 16720 et seq.). I concur in the majority opinion to the extent it concludes that defendant's conduct does not violate the Unfair Practices Act. I also agree that defendant's compliance with the Unfair Practices Act does not immunize its conduct from scrutiny under the unfair competition law.

I disagree, however, with the majority's novel and unsupported conclusion that under the unfair competition law, an "unfair . . . business act or practice" is one that threatens an "incipient violation" of "an antitrust law," one that violates the "policy or spirit" of an antitrust law, or one that "significantly threatens or harms competition"—conduct that collectively might be described as falling within the penumbra of antitrust law. The

---

*Associate Justice of the Court of Appeal, Fifth District, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.

purpose of *antitrust law* is to prevent monopoly power or agreements restraining trade from destroying the consumer benefits provided by competition. The purpose of the legal prohibitions against *unfair business acts and practices*, by contrast, is to prevent deceptive conduct that injures a particular competitor. By recasting the statutory prohibition of unfair business acts and practices as an extension of antitrust law, the majority misinterprets the history and purpose of the unfair competition law. Moreover, the vagueness inherent in the majority's formulation of its standard will magnify the uncertainty that businesses face in trying to comply with the unfair competition law.

I

Section 17200 of the Business and Professions Code, part of the unfair competition law, defines "unfair competition" as follows: "As used in this chapter, unfair competition shall mean and include any unlawful, unfair or fraudulent business act or practice and unfair, deceptive, untrue or misleading advertising and any act prohibited by Chapter 1 (commencing with Section 17500) of Part 3 of Division 7 of the Business and Professions Code [addressing various forms of false advertising]." Because here defendant's below-cost sales are not unlawful (the trial court held they did not violate state antitrust law or the Unfair Practices Act), are not fraudulent or deceptive, and are not advertising, the issue presented is whether they are an "unfair . . . business act or practice."

A.   *Common Law Unfair Competition*

Unfair competition originated as a common law tort. At common law, before the enactment of any statutory prohibition against unfair competition, "unfair competition" had a stable and relatively narrow meaning that focused on business practices that harmed competitors by deceiving customers. (*Dunston* v. *Los Angeles Van etc. Co.* (1913) 165 Cal. 89, 94 [131 P. 115] ["relief in such cases really rests upon the deceit or fraud which the later comer into the business field is practicing upon the earlier comer and upon the public"].) Originally, it was the deceptive "passing off" of one's goods or services as those of another, commonly accomplished by appropriating the trade name of another. "The fundamental principle underlying this entire branch of the law is, that no man has the right to sell his goods as the goods of a rival trader." (*Weinstock, Lubin & Co.* v. *Marks* (1895) 109 Cal. 529, 539 [42 P. 142]; see also *Lutz* v. *Western Iron & Metal Co.* (1923) 190 Cal. 554, 561 [213 P. 962]; *Banzhaf* v. *Chase* (1907) 150 Cal. 180, 183 [88 P. 704]; *Pierce* v. *Guittard* (1885) 68 Cal. 68, 71-72 [8 P. 645].)

Even though the tort has been extended to situations other than classic "passing off," deceptive conduct has remained at the heart of unfair competition.[1] As we said in *Weinstock, Lubin & Co.* v. *Marks, supra,* 109 Cal. 529, 541, the principles of unfair competition "apply to all cases where fraud is practiced by one in securing the trade of a rival dealer; and these ways are as many and as various as the ingenuity of the dishonest schemer can invent." (See also *Schecter Corp.* v. *United States* (1935) 295 U.S. 495, 531-532 [55 S.Ct. 837, 843-844, 79 L.Ed. 1570, 97 A.L.R. 974] [" 'Unfair competition,' as known to the common law, is a limited concept. . . . Unfairness in competition has been predicated of acts which lie outside the ordinary course of business and are tainted by fraud, or coercion, or conduct otherwise prohibited by law." (Fn. omitted.)].) For example, in *American Philatelic Soc.* v. *Claibourne* (1935) 3 Cal.2d 689 [46 P.2d 135], the defendant was a stamp dealer with a stock of a stamp rare in perforated form but common in unperforated form. The defendant's stock was in the unperforated form; he perforated the stamps and offered them for sale to other dealers, disclosing that the perforations were unofficial but suggesting that they could be resold to collectors as genuine. Even though the defendant's sales to other dealers were not deceptive, this court had no trouble concluding that his sales were ultimately grounded in the deception of the collectors who were the end purchasers and that this injured the plaintiffs, dealers and collectors of genuine stamps: "[T]he conduct of [defendant] in offering for sale these privately perforated stamps will inevitably result in severe pecuniary injury to the [plaintiffs], and the gaining by [defendant] of an advantage arising out of, in the final analysis, duplicity and dishonesty." (*Id.* at p. 696.)

---

[1]In the prestatutory period, the one use of the term "unfair competition" in the common law that developed outside the area of consumer deception was trade secret misappropriation. (*Scavengers' P. Assn.* v. *Serv-U-Garbage Co.* (1933) 218 Cal. 568 [24 P.2d 489]; *Pasadena Ice Co.* v. *Reeder* (1929) 206 Cal. 697, 703 [275 P. 944, 276 P. 995]; *New Method Laundry Co.* v. *MacCann* (1916) 174 Cal. 26, 30 [161 P. 990].) Economically, however, there is a strong similarity between the deceptive misappropriation of a trade name and the form of trade secret misappropriation most common in this court's cases of that period, namely, use of a competitor's customer lists. This becomes apparent when one considers that for a transaction to occur it is not enough for a business to offer a desirable product at a competitive price. Every business also faces the problem, and expense, of searching out customers to inform them of its product and to persuade them to purchase it. In a trade name misappropriation case, the plaintiff has done so by incurring the cost of establishing a valuable trade name that serves as an efficient vehicle for disseminating information about its product to its customers. In a customer list misappropriation case, the plaintiff has done so by identifying individual customers and their needs, incurring the cost of acquiring that information. In both trade name and customer list misappropriation cases, the defendant is able to reduce its search costs incurred in obtaining new customers by free-riding on the investments of the plaintiff in searching out customers. It may have been an intuitive recognition of this similarity that led courts of the prestatutory period to extend the rubric of unfair competition to trade secret misappropriation.

B.  *Statutory Unfair Competition*

Our Legislature first recognized unfair competition in 1933 when it amended Civil Code former section 3369 (hereafter section 3369), which had addressed the availability of injunctive relief in general. The 1933 amendment had three aspects: It authorized injunctions in cases of "unfair competition"; it authorized the Attorney General, district attorneys, and private persons to seek such injunctions; and it defined "unfair competition" as any "unfair or fraudulent business practice and unfair, untrue or misleading advertising and any act denounced by Penal Code sections 654a, 654b or 654c." (Stats. 1933, ch. 953, § 1, p. 2482.)

In amending section 3369 in 1933, the Legislature provided statutory authorization of injunctive relief for unfair competition and broad standing to seek that remedy; there is no evidence, however, that the Legislature in addition intended to expand the meaning of unfair business practices beyond the type of deceptive practices recognized at common law.

This court concluded as much when, not long after section 3369's amendment, it had occasion to consider the meaning of "unfair or fraudulent business practice" and concluded the term was limited to common law unfair competition. As we explained in *International etc. Workers* v. *Landowitz* (1942) 20 Cal.2d 418 [126 P.2d 609] (hereafter *Landowitz*): "[T]he statutory definition of 'unfair competition' thus incorporated in Civil Code, § 3369, is not essentially different from that which has historically furnished the basis for equity injunctions against unfair competition." (*Id.* at p. 422.) We concluded that, because of the potential vagueness of the term "unfair competition" outside its traditional common law definition, section 3369 did not authorize injunctive relief against other business practices that might be termed unfair, even those which were violations of other business regulation statutes.

We said: "The phrase 'unfair competition' when carried beyond its traditional scope in equitable actions, however, does not have a fixed meaning in the absence of statutory definition. Courts of equity, therefore, are loath to enjoin conduct on that ground in the absence of specific authorization therefor. . . . *Civil Code, section 3369, contains no broader a definition of the term 'unfair competition' than existed at common law* and in itself furnishes no basis for an injunction against the violation of the penal ordinance [regulating competition] involved in this case." (*Landowitz, supra,* 20 Cal.2d 418, 422, italics added.)

Subsequent decisions have continued to view the unfair competition law's prohibition of any unfair business practice as a prohibition against deceptive

conduct. (See, e.g., *Bank of the West* v. *Superior Court* (1992) 2 Cal.4th 1254, 1267 [10 Cal.Rptr.2d 538, 833 P.2d 545] [under the unfair competition law, "one need only show that 'members of the public are likely to be deceived' "]; *Schwartz* v. *Slenderella Systems of Calif.* (1954) 43 Cal.2d 107 [271 P.2d 857]; *Don Alvarado Co.* v. *Porganan* (1962) 203 Cal.App.2d 377 [21 Cal.Rptr. 495]; *People* ex rel. *Mosk* v. *National Research Co. of Cal.* (1962) 201 Cal.App.2d 765, 772 [20 Cal.Rptr. 516] ["What constitutes 'unfair competition' or 'unfair or fraudulent business practice' under any given set of circumstances is a question of fact [citation], the essential test being whether the public is likely to be deceived [citation]."]; *Wood* v. *Peffer* (1942) 55 Cal.App.2d 116, 123-124 [130 P.2d 220].)

In 1963, the Legislature again amended section 3369 to add "unlawful" business practices to the list of proscribed conduct. In doing so, it expanded the definition of unfair competition with respect to conduct violating statutory prohibitions, for now any business practice that violated an independent statutory duty was an instance of unfair competition that could be enjoined even if the underlying statute did not specifically authorize injunctive relief. (*Barquis* v. *Merchants Collection Assn.* (1972) 7 Cal.3d 94, 112-113 [101 Cal.Rptr. 745, 496 P.2d 817] [section 3369 extended to " 'anything that can properly be called a business practice and that at the same time is forbidden by law' "].) For those business practices that were not statutory violations, however, the Legislature made no change to the definition of "unfair . . . business practice," implicitly accepting our interpretation in *Landowitz, supra,* 20 Cal.2d 418. (See *People* v. *Ledesma* (1997) 16 Cal.4th 90, 100-101 [65 Cal.Rptr.2d 610, 939 P.2d 1310].) In 1977 the Legislature reenacted, without substantive change, the unfair competition portion of section 3369 as Business and Professions Code sections 17200, 17201, 17202, 17203, and 17204. (Stats. 1977, ch. 299, § 1, p. 1202.) In 1992, the Legislature expanded the scope of the unfair competition law to include unfair business *acts* as well as *practices*; the operative language now reads in full: "As used in this chapter, unfair competition shall mean and include any unlawful, unfair or fraudulent business act or practice and unfair, deceptive, untrue or misleading advertising and any act prohibited by Chapter 1 (commencing with Section 17500) of Part 3 of Division 7 of the Business and Professions Code." (Bus. & Prof. Code, § 17200.) This change also did not alter the meaning of "unfair . . . business practice" but merely extended it to include single instances of conduct.

Thus, the term "unfair . . . business act or practice" continues to mean deceptive conduct that injures consumers and competitors. Because there is no allegation of deceptive conduct by defendant here, the trial court's

judgment for defendant on plaintiffs' unfair competition law cause of action was proper.

## II

The majority nevertheless holds to the contrary that the term "unfair . . . business act or practice" does not at all encompass common law unfair competition or even deceptive conduct in general. Rather, the majority creates out of whole cloth a new and amorphous definition of unfair business act or practice: conduct that threatens an "incipient violation" of "an antitrust law," that violates the "policy or spirit" of an antitrust law, or that "significantly threatens or harms competition." (Maj. opn., *ante,* at pp. 186-187.) Because none of this conduct amounts to an actual violation of antitrust law, I shall refer to these forms of conduct as penumbral antitrust threats. The majority never identifies what body of antitrust law it supposes the Legislature intended to incorporate in section 3369: Federal antitrust law? State antitrust law? Some amalgamation of the two?

Until today, no case has held or even suggested that the unfair competition law's prohibition of "any unfair . . . business act or practice" was a prohibition of penumbral antitrust threats, or that it was not a prohibition of deceptive conduct that harms competitors. Without citing any evidence of legislative intent, the majority insists nonetheless that its definition of unfair business practices is correct because in its view section 3369 as amended by our Legislature in 1933 was intended to "parallel" section 5 of the Federal Trade Commission Act (15 U.S.C. § 45; hereafter the FTC Act), the federal statute that created the Federal Trade Commission (hereafter FTC). (Maj. opn., *ante,* at p. 185.) Section 5 of the FTC Act as enacted in 1914 originally prohibited "unfair methods of competition" (38 Stat. 719). In 1938, Congress amended section 5 to include "unfair or deceptive acts or practices" in order to expand the FTC's jurisdiction to encompass deceptive and unfair conduct that injured consumers without harming competitors. (The Wheeler-Lea Act of 1938, 52 Statutes at Large 111; see also *FTC* v. *Sperry & Hutchinson Co.* (1972) 405 U.S. 233, 244 [92 S.Ct. 898, 905, 31 L.Ed.2d 170].) The FTC's jurisdiction under section 5 extends both to antitrust threats to competition and to deceptive business practices that injure competitors or consumers. (*FTC* v. *Sperry & Hutchinson Co., supra,* 405 U.S. 233, 239-246 & fn. 5 [92 S.Ct. 898, 903-906].) There is not a shred of evidence, however, that California's section 3369 is patterned after section 5 of the FTC Act, and in *Landowitz, supra,* 20 Cal.2d 418, we reached the quite different conclusion that section 3369's prohibition of any "unfair . . .

business practice" was intended to incorporate common law unfair competition.[2]

The majority's reliance on this court's statement in *Barquis* v. *Merchants Collection Assn., supra,* 7 Cal.3d 94, 110, characterizing the unfair competition law's prohibition of any "unlawful [or] unfair . . . business practice" and section 5 of the FTC Act as "parallel broad proscription[s]" is misplaced. The parallelism to which *Barquis* referred was the fact that section 5 of the FTC Act and our unfair competition law both protect consumers as

---

[2]In looking to section 5 of the FTC Act, the majority may have been misled by this court's previous statement that the unfair competition law had "its origin as one of the so-called 'little FTC Acts' of the 1930's, enacted by many states in the wake of amendments to the Federal Trade Commission Act [i.e., the Wheeler-Lea Act of 1938, 52 Statutes at Large 111, which added the phrase 'unfair or deceptive acts or practices' to the 'unfair methods of competition' prohibited by section 5 of the FTC Act] enlarging the commission's regulatory jurisdiction to include unfair business practices that harmed, not merely the interests of business competitors, but of the general public as well." (*Rubin* v. *Green* (1993) 4 Cal.4th 1187, 1200 [17 Cal.Rptr.2d 828, 847 P.2d 1044].)

Contrary to the assertion in *Rubin* v. *Green, supra,* 4 Cal.4th 1187, 1200, there were no " 'little FTC Acts' of the 1930's." The term "little FTC Act" instead denotes a group of state statutes enacted in the 1960's and 1970's; these statutes, promoted by the FTC among others, were meant to complement the deceptive practices jurisdiction of the FTC, not its antitrust jurisdiction, and they address deceptive trade practices, not antitrust threats to competition. (See, e.g., Karns, *State Regulation of Deceptive Trade Practices Under "Little FTC Acts": Should Federal Standards Control?* (1990) 94 Dick. L.Rev. 373, 373-376; Bailey & Pertschuk, *The Law of Deception: The Past as Prologue* (1984) 33 Am. U. L.Rev. 849, 861 fn. 63 [authored by two FTC commissioners]; Comment, *Consumer Protection: The Practical Effectiveness of State Deceptive Trade Practices Legislation* (1984) 59 Tul. L.Rev. 427, 428; Note, *Toward Greater Equality in Business Transactions: A Proposal to Extend the Little FTC Acts to Small Businesses* (1983) 96 Harv. L.Rev. 1621, 1621-1624; Lovett, *State Deceptive Trade Practice Legislation* (1972) 46 Tul. L.Rev. 724, 730, fn. 14.)

California has such a "little FTC Act" incorporating verbatim the language of section 5 of the FTC Act, but it is not Business and Professions Code section 17200 et seq., the unfair competition law, and it does not prohibit penumbral antitrust threats. Rather, it is Civil Code sections 1750-1784, the Consumers Legal Remedies Act, which was enacted in 1970. The act lists certain prohibited "unfair methods of competition and unfair or deceptive acts or practices" (the language of section 5 of the FTC Act), beginning with "passing off," and it provides various remedies to injured consumers. (Civ. Code, § 1770; see also Reed, *Legislating for the Consumer: An Insider's Analysis of the Consumers Legal Remedies Act* (1971) 2 Pacific L.J. 1.)

In addition to misunderstanding the term "little FTC Act," *Rubin* v. *Green, supra,* 4 Cal.4th 1187, 1200, mixes up its chronology; because section 3369 was enacted in 1933, five years before the 1938 amendment expanding the FTC's jurisdiction, it obviously was not enacted in the "wake" of that amendment. The sole authority *Rubin* cites on this point, *Bank of the West* v. *Superior Court, supra,* 2 Cal.4th 1254, 1264, is equally confused: "A host of so-called 'little FTC Acts' followed [the 1938 amendment of the FTC Act] including California's Unfair Business Practices Act. (§ 17200 et seq.; see also Civ. Code, former § 3369.)" It is worth noting that in each of these cases the question of the historical origins of the unfair competition law was not at issue and was not dispositive of any issue. Each decision discussed the point only in passing by way of background.

well as competitors, not that both prohibited penumbral antitrust threats. (See 7 Cal.3d at pp. 109-110.)

Nothing in *Barquis* v. *Merchants Collection Assn., supra,* 7 Cal.3d 94, even hinted that unfair business practices, however broad a concept, were to be equated with penumbral antitrust threats. To the extent *Barquis* might be read to suggest that the term "unfair . . . business practice" has an amorphous meaning extending in some undefined fashion beyond deceptive conduct, that suggestion is entirely dictum, for the issue decided in that case was whether the business practice in question was *unlawful,* not whether it was *unfair.* The suggestion is also unsound. Not only is it contrary to the historical development of the unfair competition law explained above, but it is based on *Barquis*'s misquotation of the unfair competition law. In substituting the word "deceptive" for the word "fraudulent," *Barquis* suggested that unfair practices were a category distinct from deceptive practices. (Compare section 3369 [prohibiting any "unlawful, unfair or fraudulent business practice"] with *Barquis, supra,* at p. 111 [quoting section 3369 as prohibiting any " 'unlawful, unfair or deceptive business practice' " (italics omitted)].)[3]

Moreover, the majority misunderstands the term "unfair methods of competition" in section 5 of the FTC Act to mean only penumbral antitrust threats. (See maj. opn., *ante,* at p. 186, fn. 11; *id.* at p. 187.) As interpreted by the FTC and the federal courts, that phrase covers not only the penumbral antitrust threats the majority focuses on but also actual violations of the antitrust law and in addition acts of unfair competition having nothing to do

---

[3]The majority also misunderstands the significance of *Barquis*'s statement that "section 3369 indicates that 'unfair competition' as used in the section cannot be equated with the common law definition of 'unfair competition,' but instead specifies that, for the purposes of its provisions, unfair competition 'shall mean and include *unlawful, unfair* or fraudulent business practice . . . .' " (*Barquis* v. *Merchants Collection Assn., supra,* 7 Cal.3d at p. 109, italics original; see maj. opn., *ante,* at p. 181, fn. 9.) Our point was that the unfair competition law expanded beyond the limits of common law unfair competition along two dimensions: First, because the unfair competition law provided relief for injury to consumers even absent any showing of injury to a competitor, it "extended to the entire consuming public the protection once afforded only to business competitors." (*Barquis* v. *Merchants Collection Assn., supra,* 7 Cal.3d at p. 109; see also *id.* at p. 110 ["the courts, in interpreting the section, have long declared that the provision is at least as equally directed toward 'the right of the *public* to protection from fraud and deceit[,]' as toward the preservation of fair business competition" (italics original)].) Second, because the unfair competition law included *unlawful* as well as *unfair* business practices, it prohibited a broader range of conduct than did common law unfair competition. (*Id.* at pp. 112-113.) Specifically, the unfair competition law prohibited not only the deceptive conduct that was an "unfair . . . business practice" but also, as an "unlawful . . . business practice," " 'anything that can properly be called a business practice and that at the same time is forbidden by law.' " (*Id.* at p. 113.) Nothing in *Barquis* suggested, however, that the term "unfair . . . business practice" meant penumbral antitrust threats, or that it did not mean deceptive conduct.

with antitrust law, including passing off and other forms of common law unfair competition and consumer deception. (See, e.g., *FTC* v. *Sperry & Hutchinson Co., supra,* 405 U.S. 233, 243, 244 [92 S.Ct. 898, 904-905] ["unfair competitive practices were not limited to those likely to have anticompetitive consequences after the manner of the antitrust laws"]; *Sears, Roebuck & Co.* v. *Federal Trade Commission* (7th Cir. 1919) 258 F. 307, 311 [the first FTC enforcement action to be judicially reviewed, a case of deceptive advertising; "The commissioners, representing the government as parens patriae, are to exercise their common sense, as informed by their knowledge of the general idea of unfair trade at common law, and stop all those trade practices that have a capacity or a tendency to injure competitors directly or through deception of purchasers . . . ."]; FTC, Ann. Rep. (1935) 67-71 [Listing 27 "unfair methods of competition" prohibited by the FTC: "9. Passing off goods or articles for well and favorably known products of competitors through appropriation or simulation of such competitors' trade names, labels, dress of goods, etc. . . ."], quoted in Handler, *Unfair Competition* (1936) 21 Iowa L.Rev. 175, 244-248; Bailey & Pertschuk, *The Law of Deception: The Past as Prologue, supra,* 33 Am. U. L.Rev. 849.)

Nor is there any other sound reason for presuming that our Legislature intended section 3369 to incorporate the antitrust portion of section 5 of the FTC Act. In amending section 3369 in 1933 to authorize injunctive relief against "[a]ny person performing or proposing to perform an act of unfair competition," the Legislature was acting in a field already well established by the common law. There is no reason to suppose that, without any express statement, the Legislature implicitly intended to reject the *common law* definition of unfair competition and adopt instead *antitrust law* as the definition of unfair competition. The majority offers no explanation why, if the Legislature in 1933 had wished to expand the scope of the antitrust laws to reach penumbral antitrust threats, it would have chosen the roundabout method of using a term—"unfair competition"—with an established meaning independent of antitrust law and amending a Civil Code provision relating to the general availability of injunctive relief, rather than directly amending California's antitrust law, the Cartwright Act, in terms that clearly evidenced its intent to broaden the scope of antitrust law. This is especially so if by its reference to "the antitrust laws" the majority includes federal antitrust law. It would be most implausible for the Legislature, if it intended to incorporate the entire body of federal antitrust law, the law of another sovereign, to seek to do so implicitly simply by using the term "unfair . . . business practice" without any reference to federal law. Given the absence of any evidence that the Legislature intended to vary or reject that common law understanding of unfair business practices as practices that harm competitors by deceiving

customers, the only reasonable conclusion is that the Legislature intended to adopt that understanding. This is the conclusion our court reached in *Landowitz, supra*, 20 Cal.2d 418.

### III

In addition to being unfounded, the majority's definition will not solve the problem it identifies: the costs imposed on businesses by a vague and overbroad definition of unfair business practice. I can imagine no greater recipe for confusion and uncertainty than the majority's penumbral antitrust threat standard. It is difficult enough for courts and businesses alike to determine whether a business practice amounts to an *actual* violation of the antitrust laws prohibiting restraint of trade or exclusionary monopolistic conduct. A business seeking to guide its competitive conduct by the majority's standard will be put to the impossible task of deciding whether its conduct, even though not a violation of the antitrust laws, violates the "spirit" of the antitrust laws or is an "incipient" violation of those laws or is a threat to competition. A prominent antitrust treatise has criticized the FTC for enforcing section 5 of the FTC Act in cases of incipient antitrust violations or violations of the spirit of the antitrust laws, and it has argued that only actual violations of federal antitrust law should be actionable under section 5. (2 Areeda & Hovenkamp, Antitrust Law (1995 rev. ed.) ¶ 307, pp. 21-28.) There is no reason or need to import the uncertainty of section 5 into California law.

Even more significantly, the majority ignores two crucial distinctions that make the standard of section 5 of the FTC Act an inappropriate standard for private civil litigation:

First, the interpretation of section 5 that the FTC has developed is an administrative standard, whose enforcement is subject to the informed discretion of an administrative agency with considerable economic expertise and regulatory experience. When questions arise as to the anticompetitive impact of a particular business practice, the FTC and its professional staff are able to investigate and analyze that practice not only for its impact on the consumers and competitors most immediately affected by the practice but for its potential to disrupt competition in the economy as a whole. The FTC can then use this broad base of data to exercise its discretion in determining whether the practice in question truly threatens competition to a degree that justifies the costs of suppressing the practice. By contrast, a court has no similar resources or competence for deciding wide-ranging questions of economic policy. "Unlike the courts, the Commission is not one or a few

judges acting solely on a record made by plaintiff and defendant. It is an elaborate institution of many lawyers, economists, researchers, and other professionals. Its facilities for gathering facts about a particular respondent and a segment of the economy are vastly superior to those of a court. Its specialized personnel provide a capacity for in-depth probes far beyond that of the courts." (2 Areeda & Hovenkamp, Antitrust Law, *supra*, ¶ 307, p. 26.) These justifications for having an administrative agency search out incipient antitrust violations and threats to competition before they have ripened into actual antitrust violations do not support permitting private plaintiffs to do so in a judicial forum.

Second, if the FTC does find a business's practice to be an incipient antitrust violation or a threat to competition and decides that it should be suppressed, it is limited to awarding only prospective relief in the form of a "cease-and-desist order" instructing the business to modify its future conduct. (15 U.S.C. § 45.) A business subject to an FTC cease-and-desist order does not face any civil or criminal penalties or monetary liability for its past conduct. By contrast, a defendant in an unfair competition law action may face massive restitutionary liability to the plaintiff and to others similarly situated. The majority proposes to use the FTC's section 5 standard to impose retrospective monetary liability for conduct that does not violate any antitrust law but that in the opinion of one judge may, if continued, threaten to violate an antitrust law in the future. This grossly distorts the purpose of that standard, which was to terminate present conduct not in violation of any law that, if unchecked, would ripen into unlawful anticompetitive conduct, not to impose liability for past lawful conduct.

## IV

Even if the majority were correct that an "unfair . . . business act or practice" is properly defined as one that threatens an "incipient violation" of the state antitrust laws, one that violates the "policy or spirit" of the state antitrust laws, or one that "significantly threatens or harms competition," there is no basis for a retrial here. A defendant's motion for judgment in a bench trial occurs at the close of the plaintiff's case. (Code Civ. Proc., § 631.8.) Its premise is that, even without the presentation of any opposing evidence by the defendant, the plaintiff's evidence is insufficient to prove its claims by a preponderance of the evidence.

Here, to defeat defendant's motion for judgment, it was plaintiffs' burden to present all their evidence on their unfair competition cause of action and to prove by a preponderance of the evidence that defendant's price cutting

was unfair competition. In addition, both as part of its Unfair Practices Act cause of action and as part of its Cartwright Act antitrust action, plaintiffs presented evidence attempting to prove that defendant's price cutting had injured competition. They failed to prove this.

A plaintiff attempting to show that price cutting is an incipient violation of the antitrust laws, a violation of their policy or spirit, or a substantial threat or harm to competition faces a heavy burden. Ordinarily, price cutting is the *essence* of competition, not a substantial threat to it. Prices are the primary medium through which business entities compete. " 'Low prices benefit consumers regardless of how those prices are set . . . .' " (*Brooke Group Ltd.* v. *Brown & Williamson Tobacco Corp.* (1993) 509 U.S. 209, 223 [113 S.Ct. 2578, 2588, 125 L.Ed.2d 168].) Here, the consumer is interested only in the total price of a telephone plus service. As plaintiffs admit in their brief: "What matters to the consumer is the total cost of a telephone and service . . . ." It is not disputed that defendant's price discounting has reduced the total cost of a telephone and service, making the cellular telephone and cellular service more affordable to greater numbers of consumers, thereby increasing consumer welfare.

Price discounting is only a threat to competition in very narrow circumstances, when it becomes "predatory." In predatory pricing, a firm "invests" in below-cost pricing to drive its competitors out of the market, with the expectation that it will then be able to raise its prices to supracompetitive levels and earn monopoly profits to recoup its investment in below-cost sales. (*Brooke Group Ltd.* v. *Brown & Williamson Tobacco Corp., supra,* 509 U.S. 209, 224 [113 S.Ct. 2578, 2588-2589]; 3 Areeda & Turner, Antitrust Law (1978) ¶ 711b, p. 151 ["predation in any meaningful sense cannot exist unless there is a temporary sacrifice of net revenues in the expectation of greater future gains"].) Predatory pricing only makes economic sense to the predator if it has a substantial expectation of recouping its costs by raising its prices to "supracompetitive" levels once competitors are eliminated. (*Brooke Group Ltd.* v. *Brown & Williamson Tobacco Corp., supra,* 509 U.S. 209, 224 [113 S.Ct. 2578, 2588-2589]; 3 Areeda & Turner, Antitrust Law, *supra,* ¶ 711b, p. 151.) "Without [recoupment], [below-cost] pricing produces lower aggregate prices in the market, and consumer welfare is enhanced." (*Brooke Group Ltd.* v. *Brown & Williamson Tobacco Corp., supra,* 509 U.S. at p. 224 [113 S.Ct. at p. 2588].)

For supracompetitive pricing and recoupment to occur, however, the predator must acquire not only market share but market power by creating conditions that would prevent new competitors from reentering the market

once the predator raises prices to supracompetitive levels. (*Brooke Group Ltd.* v. *Brown & Williamson Tobacco Corp., supra,* 509 U.S. at pp. 225-226 [113 S.Ct. at pp. 2589-2590]; *Matsushita Elec. Industrial Co.* v. *Zenith Radio* (1986) 475 U.S. 574, 590-591 [106 S.Ct. 1348, 1358, 89 L.Ed.2d 538] ["In order to recoup their losses, [predators] must obtain enough market power to set higher than competitive prices, and then must sustain those prices long enough to earn in excess profits what they earlier gave up in below-cost prices."]; 3 Areeda & Turner, Antitrust Law, *supra,* ¶ 711b, pp. 151-152.) Because such barriers to entry rarely exist, "proven cases of predatory pricing have been extremely rare." (3 Areeda & Turner, Antitrust Law, *supra,* ¶ 711b, p. 152.)

As the trial court here found, defendant L.A. Cellular's purpose in making below-cost sales of cellular telephones was not to drive plaintiffs out of the telephone sales business or even to divert business from them but to compete with AirTouch Cellular (the other cellular service provider in Los Angeles) for customers in the cellular service market. Thus, defendant did not have a predatory intent to drive competitors out of business.

Nor did defendant's conduct have a predatory effect. Plaintiffs presented no evidence that the exit of these plaintiffs, or all independent telephone hardware sellers, from the cellular telephone market would injure competition by permitting defendant to raise its prices at all, much less raise them to supracompetitive levels. Nor did plaintiffs present evidence of substantial barriers to entry that would preclude others such as consumer electronics retailers from entering the cellular telephone market should defendant raise prices supracompetitively. "[U]nsuccessful predation is in general a boon to consumers. [¶] That below-cost pricing may impose painful losses on its target is of no moment to the antitrust laws if competition is not injured: It is axiomatic that the antitrust laws were passed for 'the protection of *competition,* not *competitors.'* " (*Brooke Group Ltd.* v. *Brown & Williamson Tobacco Corp., supra,* 509 U.S. 209, 224 [113 S.Ct. 2578, 2588], original italics.)

The majority speculates nonetheless that plaintiffs might be able to show that defendant harmed competition by its price discounting. (Maj. opn., *ante,* at pp. 187-188.) It rests this theory on the premise that defendant is a duopolist in the cellular service market and that plaintiffs are legally precluded from competing with defendant by selling phones below cost and offsetting those losses with profits from cellular service sales.

The majority's premise is false, as the trial record created by plaintiffs shows. Plaintiffs' economics expert testified that defendant L.A. Cellular

and its service competitor AirTouch Cellular are required by the California Public Utilities Commission to wholesale cellular airtime to independent resellers at 77 percent of retail cost. Thus, they are not a true duopoly, and others compete with them for the retail sale of cellular service. Some of the plaintiffs are retailers of cellular service, and it appears the rest could be. Plaintiffs offered no evidence that they could not have competed with defendant by selling telephones for similar below-cost prices and recouping their losses through profits on accompanying sales of service. If plaintiffs' argument is that the harm to competition rests on defendant's cross-subsidization of telephone sales by service profits that plaintiffs could not have earned, they bore, but did not meet, the burden of showing they could not have earned similar profits.

If on remand the trial court enjoins defendant L.A. Cellular under the unfair competition law from making below-cost sales of its cellular telephones, defendant will then undoubtedly seek to enjoin its service competitor AirTouch Cellular from making similar below-cost telephone sales. The result will be judicially imposed price fixing of minimum retail prices, establishing the sort of retail price maintenance that the antitrust laws condemn when resulting from agreements among market participants. Price fixing by litigation will replace price reduction by competition, and the ultimate loser will be the consuming public.

The majority's theory will also subject businesses owning patents and copyrights to unfair competition liability in many instances. Like defendant L.A. Cellular's cellular service license, a patent or copyright for a successful product is a government-granted franchise from which competitors are excluded. A business using revenue from its patents or copyrights to fund operations in another line of business is no different from defendant's use of its cellular service revenues to subsidize sales of cellular telephones. In doing so, the patent or copyright owner would be subsidizing that other line of business with patent or copyright revenue that its competitors in that line of business are legally precluded from earning, just as a cellular service licensee making below-cost telephone sales subsidizes those sales with cellular service profits that its competitors are legally precluded from earning. Thus, in these circumstances patent and copyright owners too will be subject to liability under the majority's theory.

If cross-subsidization between the regulated market for cellular service and the unregulated market for cellular telephones is a problem, there is no need to distort the unfair competition law to address it. There are both state and federal regulatory bodies charged with protecting consumer welfare

against injurious practices in the cellular marketplace (the Federal Communications Commission and the California Public Utilities Commission). They are far better equipped than a court of equity to determine whether cross-subsidization is causing consumer injury and, if so, what remedy should be imposed. How would a court determine the proper minimum resale price for cellular telephones? The cost of the telephones to defendant? That cost plus some fixed markup? Or the marginal cost of the telephones to defendant plus all the other expenses of selling the telephones? Or the average variable cost? Even telephone sales by a cellular carrier at or above the cost of the telephones themselves may be "subsidized" by service revenues if those revenues are used to pay for the other expenses incurred in making telephone sales (e.g., a newspaper ad by defendant for cellular service may also advertise a cellular phone; subsidization is occurring if these advertising costs, or any overhead or other indirect sales costs, are paid for by cellular service revenue). How would a court take these subsidies into account? The majority provides no answer to these difficult questions.

In sum, I doubt whether price discounting that is not predatory, is not done with the intent to injure competition, does not violate the Unfair Practices Act or other statutes, is not fraudulent, and increases consumer welfare by making more goods or services available to more people at lower prices can ever be an unfair business practice, even under the majority's standard. It certainly is not on the record that plaintiffs have presented.[4]

### Conclusion

The majority's amorphous definition of an "unfair . . . business act or practice" as one that threatens an "incipient violation" of the antitrust laws, one that violates the "policy or spirit" of the antitrust laws, or one that "significantly threatens competition" is at once too narrow and too broad. It is too narrow to the extent that it reduces the prohibition against unfair business practices to nothing more than an appendage of antitrust law. Doing so ignores the distinct history and purpose of the unfair competition law's prohibition of unfair business practices, which was to protect consumers and individual competitors against injuries caused by consumer deception, not to protect or advance competition. Antitrust law, by contrast, is not concerned with protecting individual competitors, nor with preventing acts of deception, but rather with the threats to competition and consumer welfare posed by monopoly power and agreements restraining trade. There is no evidence our Legislature intended the unfair competition law to be an antitrust law.

---

[4] I note that the FTC has taken no reported action anywhere in the United States to oppose the below-cost distribution of cellular telephones by cellular service providers. Apparently, unlike the majority, it sees no significant threat to competition from this widespread practice.

The majority's definition is too broad to the extent that it encompasses not violations of antitrust law but what might be called "antitrust lite": such vague and dubious metaphysical entities as incipient violations, violations of policies and spirits, and anything that might be characterized as a significant threat or harm to competition. That definition will provide no certainty to businesses seeking to know what conduct the unfair competition law prohibits, given the inherent vagueness of the majority's concepts of an "incipient violation" of an antitrust law, violations of the "policy or spirit" of an antitrust law, and "significant" threats or harms to competition.

I would instead adhere to our historical understanding that the core of an unfair business practice is conduct that deceives consumers. As there is no allegation or evidence of deceptive conduct by defendant, plaintiffs' unfair competition claim fails.

Even if I were to apply the majority's definition here, however, I would conclude that plaintiffs have failed to show that defendant's price cutting is predatory and harmful to competition. The purpose of competition is to drive prices down. Although the unfair competition law protects competitors, even under the majority's definition it does not protect competitors at the expense of competition. That is, the unfair competition law does not authorize injunctive relief that harms consumer welfare by setting minimum prices that increase the prices consumers pay.

To claim, as the majority does, that the unfair competition law is an antitrust law aimed at maximizing consumer welfare and yet conclude, as the majority also does, that on this record a court could determine that consumer welfare would be enhanced by raising the prices of cellular telephones is an exercise in contradiction. Because price discounting is the primary medium of competition, to prohibit it here would elevate the interests of plaintiffs far above those of consumers. Competitors that sell below-cost phones may hurt plaintiffs, but they help consumers by making cellular telephones more affordable.

For the reasons discussed above, I dissent from the majority's analysis of the meaning of unfair business practice under the unfair competition law, and I would affirm the trial court's judgment in favor of defendant L.A. Cellular.

**BAXTER, J.,** Concurring and Dissenting.—I concur in the judgment insofar as it reverses the judgment of the trial court for defendant on the cause of action brought under section 17204 of the Business and Professions Code for

violation of the unfair competition law (UCL) (§ 17200 et seq.).[1] I dissent insofar as the majority affirm judgment for defendant on the sections 17043, 17044, Unfair Practices Act (UPA) (§ 17000 et seq.), causes of action.

While I have several reservations about the majority opinion, my principal concern is that the majority construe the UPA as permitting below-cost sales which injure competitors and/or destroy competition because the intent of the below-cost seller is to compete, but not to cause injury. This construction is inconsistent with the purpose and language of the UPA, in particular sections 17050, subdivision (d), and 17071 under which the statutory presumption of intent or purpose to injure competitors or destroy competition arising on proof of below-cost sales may be rebutted only by proof of a good faith belief that the price of a competitor with which the below-cost sale was to compete was a legal price. Under the majority construction, intent to injure becomes a subjective element of a section 17043 violation, rather than the objective element created by the section 17071 statutory presumption, and the limited exceptions to the ban on below-cost sales created by section 17050 are expanded far beyond those intended by the Legislature.

At the same time as they restrict UPA liability and abrogate an objective standard of intent, the majority expand potential liability under the UCL for "unfair" practices, again importing subjectivity into a law that no longer gives fair warning of conduct that may be deemed unlawful. Another regrettable consequence of the majority approach is an unnecessary divergence between California laws governing anticompetitive conduct and federal antitrust law, in particular a departure from the intent to injure concept that is part of the federal antitrust distinction between "competitive" and "predatory" pricing. The result will create uncertainty in the business community over potential liability for conduct that is permissible under federal law and under the UPA, but may, nonetheless, be deemed "unfair" under the UCL. Both the UPA and the UCL are susceptible to a construction that would largely eliminate that uncertainty and more closely conform to the apparent legislative intent underlying the California law. The majority reject this opportunity to adopt that construction.

I also have reservations about the majority's conclusion that "purpose" as used in section 17043 has a narrower meaning than "intent." I doubt that the Legislature had this distinction in mind when the UPA was enacted.

---

[1]All statutory references are to the Business and Professions Code unless otherwise indicated.

# I

## *Background*

Plaintiffs include wholesale and retailer sellers of cellular phones, as well as resellers of cellular service who are wholesalers of cellular telephones, two of whom also sell cellular telephones at retail. Defendant Los Angeles Cellular Telephone Company (L.A. Cellular), a cellular service provider, also engages in the wholesale and retail sale of cellular phones. Although L.A. Cellular's principal market is the provision of cellular service, because it has opted to sell cellular phones to its agents and to customers of its cellular service, it is competing in the wholesale and retail markets for sale of cellular phones. Thus plaintiffs are competitors which defendant reasonably should have known might be injured by below-cost sales in either market. Although the record shows that competition in the sale of cellular phones has not been destroyed as a result of defendant's conduct, and sellers continue to enter the market, the record also demonstrates that defendant's conduct did injure plaintiffs, its competitors, who were in business when the below-cost sales complained of in this action occurred.

Plaintiffs' evidence established that as a result of its inability to compete with defendant's subsidized below-cost sales,[2] plaintiff Cel-Tech Communications, Inc. (Cel-Tech) was ceasing operations. Plaintiffs Comtech, Inc. and Cellular Service, Inc., the resellers of cellular service, suffered business declines when their equipment sales deteriorated because they could not

---

[2]"Cost" is defined in section 17026: " 'Cost' as applied to production includes the cost of raw materials, labor and all overhead expenses of the producer.

" 'Cost' as applied to distribution means the invoice or replacement cost, whichever is lower, of the article or product to the distributor and vendor, plus the cost of doing business by the distributor and vendor and in the absence of proof of cost of doing business a markup of 6 percent on such invoice or replacement cost shall be prima facie proof of such cost of doing business.

" 'Cost' as applied to warranty service agreements includes the cost of parts, transporting the parts, labor, and all overhead expenses of the service agency.

"Discounts granted for cash payments shall not be used to reduce costs."

Section 17029 provides, in turn: " 'Cost of doing business' or 'overhead expense' means all costs of doing business incurred in the conduct of the business and shall include without limitation the following items of expense: labor (including salaries of executives and officers), rent, interest on borrowed capital, depreciation, selling cost, maintenance of equipment, delivery costs, credit losses, all types of licenses, taxes, insurance and advertising."

Finally, section 17073 provides: "Proof of average overall cost of doing business for any particular inventory period when added to the cost of production of each article or product, as to a producer, or invoice or replacement cost, whichever is lower, of each article or product, as to a distributor, is presumptive evidence of cost of each such article or product involved in any action brought under this chapter."

compete with defendant's below-cost sales. All plaintiffs were injured as a result of their inability to compete with those below-cost sales.

Judgment for defendant was entered pursuant to Code of Civil Procedure section 631.8, supposedly at the close of plaintiffs' evidence. However, in their case-in-chief, plaintiffs had called an officer of defendant L.A. Cellular as an adverse witness pursuant to Evidence Code section 776[3] and defendant was allowed to call that person as a defense witness. Thus, the record reflects not only plaintiffs' evidence of below-cost sales of cellular phones by defendant and injury to plaintiffs and to competition in the cellular phone market, but also defendant's explanation of its purpose in doing so. That purpose, the trial court found, was only to compete with its competitor in the cellular service market, AirTouch Cellular (then PacTel). Before it launched its below-cost sales program, L.A. Cellular had been unable to attract new customers for its cellular service because the high prices for cellular phones deterred prospective subscribers. Thus, by its below-cost sales, defendant sought to compete in the cellular service market, not to injure sellers engaged only in equipment sales.

Perhaps the most dramatic evidence of the actual injurious effect of L.A. Cellular's below-cost sales, however, was the impact on plaintiff Cel-Tech. That impact on plaintiff Cel-Tech was staggering. Cel-Tech, a privately owned company started by its owner with $4,000 in savings, was clearly a very successful business before defendant launched its below-cost sales campaign, having grown from nothing in 1984 when it started business as a retail seller to $36 million in revenues and $2 million in gross profits by 1992. At that time it was primarily a wholesaler/distributor of cellular phones, and was the largest distributor of cellular phones in Los Angeles and one of the largest in the nation. Based on its volume of sales, Cel-Tech became a distributor for several manufacturers and private label producers of cellular phones, among them Mitsubishi International, Mitsubishi Electric, NEC, OKI, Toshiba, Ericsson/GE, and Pioneer from which it was able to purchase cellular phones at or very near the price charged to carriers. It sold cellular phones to retailers who sold to "end users," and to resellers, including agents of L.A. Cellular and AirTouch. By the end of 1994 it was out of the business of cellular phone sales and distribution as both a retailer and distributor and was liquidating its inventory as a direct result of defendant's below-cost sales. It could not compete without selling its phones below cost.

---

[3]Evidence Code section 776, subdivision (a): "A party to the record of any civil action, or a person identified with such a party, may be called and examined as if under cross-examination by any adverse party at any time during the presentation of evidence by the party calling the witness."

Not only was it unable to make a profit, it could not even cover its overhead costs.

The trial court found that "L.A. Cellular was doing what it said it was doing, which was keeping a watchful eye on the ads and setting its hardware prices to compete with its major competitor, AirTouch, and to increase its sale of service activations. Those were L.A. Cellular's primary motivations and . . . injury to the plaintiffs was unintended." The Court of Appeal, correctly, disagreed with the trial court's further finding that L.A. Cellular did not know that its conduct would injure plaintiffs. It held, and I agree, that the record contained substantial evidence that the injury to plaintiffs was readily foreseeable.

The Court of Appeal questioned the sufficiency of the evidence to support a conclusion that L.A. Cellular's purpose was only to compete with Air-Touch for market share in the cellular service industry. I share that skepticism. My review of the record supports plaintiffs' claim that the record is equally susceptible to a conclusion that AirTouch lowered its prices for cellular phones in order to meet the predatory pricing of L.A. Cellular. Regardless of how this question should be resolved, however, the record contains no evidence that if L.A. Cellular acted to meet the prices of AirTouch for cellular phones, it did so with a good faith belief that those prices were legal.

## II

### *The "Purpose" Element of a Section 17043 Violation*

I agree with the majority that "intent" and "purpose" may have different meanings. "Intent" may encompass both acts done with the intent to cause a particular result and those undertaken with knowledge that there is a substantial certainty that the result will follow, while "purpose" encompasses only the former. I do not agree that the Legislature intended that distinction in the UPA, however.

A statute must be construed with regard to the statutory scheme of which it is a part and the court should give meaning to every word if possible, avoiding a construction that will render any part surplusage. (*Briggs* v. *Eden Council for Hope & Opportunity* (1999) 19 Cal.4th 1106, 1118 [81 Cal.Rptr.2d 471, 969 P.2d 564] (*Briggs*); *People* v. *Comingore* (1977) 20 Cal.3d 142, 147 [141 Cal.Rptr. 542, 570 P.2d 723].) A court will normally presume that when the Legislature uses different words in the same connection in different parts of a statute that a different meaning was intended.

(*Briggs, supra,* 19 Cal.4th at p. 1117.) In the UPA , however, the Legislature appears to have used "intent" and "purpose" interchangeably. The enforcement provisions of the law suggest that the distinction drawn by the majority was not intended.

One provision describing conduct proscribed by the UPA uses "intent" to describe the mental element of the offense. Section 17040 prohibits locality discrimination, other than in a good faith effort to meet a competitive price, when the discrimination is "with intent to destroy the competition" of a regularly established dealer in the product, or to prevent competition by a person who intends to become a dealer in the product. Of the other UPA provisions defining offenses, only sections 17043 and 17044 (by incorporation of section 17030) use the term "purpose," the former to require for violation through below-cost sales a mental element of acting with the "purpose of injuring competitors or destroying competition," the latter to require as a "loss leader" element a "purpose . . . to induce, promote or encourage the purchase of other merchandise." (§ 17030.) Absent some reason to believe that the Legislature intended broader applicability of the offense defined in section 17040 than that in section 17043, it is difficult to accept the construction proposed by the majority. Under the majority construction, locality discrimination is an offense if the actor knew or reasonably should have known that the discrimination would injure competitors or destroy competition, but the same actor whose below-cost sales caused identical harm would be liable and subject to an injunction only if the actor's purpose was to injure or destroy competition.

Moreover, the presumptions and evidentiary rules created by the UPA refer to proving the "purpose or intent" of the actor. Section 17071 provides that below-cost sales are "presumptive evidence of the purpose or intent to injure competitors or destroy competition." Section 17071.5 provides that a retailer's limitation of quantity in a below-cost sale creates a "presumption of the purpose or intent to injure competitors or destroy competition." Section 17075 permits introduction of evidence of prevailing wages to "prove the intent or purpose" to violate the UPA.

Finally, section 17095 provides: "Any person, who, either as a director, officer or agent of any firm or corporation or as agent of any person, violating the provisions of this chapter, assists or aids, directly or indirectly, in such violation is responsible therefore equally with the person, firm or corporation for which he acts." The UPA provisions authorizing injunctive relief and criminal prosecution against an agent of the offending party then provide that it is sufficient to prove the "unlawful *intent* of the person, firm

or corporation for which he acts." (§§ 17096, 17101, italics added.) Under the majority construction, the principal that makes below-cost sales or uses loss leaders violates the UPA only if acting for the purpose of injuring or destroying competition, but an agent of the principal is liable if the principal acted with knowledge that this was a probable result.

I am at a loss to understand why the Legislature would relieve from UPA liability a principal that acted with knowledge or reason to know that below-cost pricing would injure competitors, but impose liability on an agent of the principal on the ground that the principal had such knowledge or had reason to know. Yet this is the result of the distinction between "purpose" and "intent" drawn by the majority.

On this basis alone I would hold that plaintiffs made a prima facie showing of the specific intent element of a section 17043 or 17044 violation by presenting evidence that defendant engaged in below-cost sales and used loss leaders in circumstances in which it knew or should have known because of the substantial certainty of the impact of those sales that the below-cost sales would injure competitors and destroy competition. That defendant's purpose was only to compete with AirTouch is irrelevant. The UPA permits price competition. Except in narrowly defined circumstances, however, it does not permit below-cost sales which the actor knows or should know will injure competitors or destroy competition. If a competitor is engaging in unlawful below-cost sales the UPA provides a remedy which will restore competition to the market—an injunction against the competitor's unlawful below-cost sales. (§ 17070.)

III

*Rebutting the Presumption of Injurious Intent or Purpose*

The most disturbing aspect of the majority's construction of the below-cost sales prohibition of the UPA, however, lies in their assumption that below-cost sales do not violate section 17043 if the below-cost seller acts with intent to compete with another seller of the same product and does not have the conscious intent or purpose to injure competitors or destroy competition, regardless of whether the below-cost seller has a good faith belief that the price of the competitor is a legal price. With due respect, this cannot have been the intent of the Legislature. The majority holding in this respect is inconsistent with the legislative purpose underlying the UPA, the statutory presumption of violation the Legislature created, and the limited circumstances in which the Legislature permits the presumption to be rebutted.

The UPA was enacted "to safeguard the public [interest] against the creation or perpetuation of monopolies and to foster and encourage

competition . . . ." (§ 17001.) The Legislature has demonstrated recognition that enforcement of the antitrust laws is critical to achieving the purpose of the law. It has done so by permitting private as well as governmental enforcement and by providing for treble damages (§ 17082) as further encouragement for enforcement. It also directs that the UPA be liberally construed (§ 17002) and, to ensure that violators will not escape liability by claiming lack of intent to injure competition, in section 17071 has created a presumption of intent or purpose to injure competitors or destroy competition, a presumption which arises on a showing of below-cost sales and injury.

As the trial court and Court of Appeal recognized, the Legislature has not placed on a UPA plaintiff the heavy burden of proving the subjective intent or purpose of a competitor who makes below-cost sales. Absent a "smoking gun" memorandum or "e-mail" revealing a below-cost seller's subjective intent to injure competitors or destroy competition, proof of such intent or purpose is well nigh impossible to come by. Instead of demanding this of injured competitors of the below-cost seller, the Legislature has created a presumption of intent or purpose which arises on proof of both below-cost sales and injurious effect. It then has defined the circumstances in which those sales do not violate the UPA, shifting the burden to the defendant to establish that one of those circumstances motivated the sales.

Section 17071 creates the presumption: "In all actions brought under this chapter proof of one or more acts of selling or giving away any article or product below cost or at discriminatory prices, together with proof of the injurious effect of such acts, is presumptive evidence of the purpose or intent to injure competitors or destroy competition."[4]

At the time most sales underlying this action took place, section 17050 defined the circumstances in which below-cost sales are permissible and thereby established the means by which a defendant may rebut the presumption of injurious purpose or intent: It provides in pertinent part:

"The prohibitions of this chapter against locality discrimination, sales below cost, and loss leaders do not apply to any sale made:

"(a) In closing out in good faith the owner's stock or any part thereof . . . .

"(b) When the goods are damaged or deteriorated in quality . . . .

---

[4]Section 17071.5 creates a similar presumption when a retailer's limitation of quantity and sale of the item below invoice or replacement cost is established.

"(c) By an officer acting under the orders of any court.

"*(d) In an endeavor made in good faith to meet the legal prices of a competitor selling the same article or product, in the same locality or trade area and in the ordinary channels of trade.*

"(e) In an endeavor made in good faith by a manufacturer, selling an article or product of his own manufacture, in a transaction and sale to a wholesaler or retailer for resale to meet the legal prices of a competitor selling the same or a similar or comparable article or product, in the same locality or trade area and in the ordinary channels of trade." (*Ibid.*, italics added.)

An additional exception to the ban on below-cost sales, available only to providers of cellular service and operative only as of January 1, 1994, is now found in section 17026.1, subdivision (a)(2). That subdivision authorizes below-cost sales of cellular phones by a provider of cellular service competing with another provider of cellular service. Section 17026.1, subdivision (a)(2), provides: "*Consistent with the provisions of subdivision (d) of Section 17050*, providers of cellular services shall be permitted to sell cellular telephones below cost, provided that sales below cost are a good faith endeavor to meet the legal market prices of competitors in the same locality or trade area." (Italics added.) This express authorization to sell equipment below cost to compete with the legal price of a company competing primarily in the market for cellular service which the Legislature described as being "[c]onsistent with subdivision (d) of Section 17050," confirms that the only competition-based exception to the sections 17043 and 17044 ban on below-cost sales is for sales made to compete with what is believed in good faith to be a legal price of a competitor. The below-cost seller cannot rebut the presumptive intent to injure competitors or destroy competition with evidence that it simply intended to compete, not to injure.

The majority assume without discussion that section 17050 is not the exclusive means by which a defendant may rebut the presumption of section 17071 and establish the absence of intent or purpose to injure or destroy competition. They hold that even if a person selling below cost does so for competitive reasons other than a good faith attempt to meet a competitor's legal price, there is no violation of section 17043 absent a purpose to injure competition in the market for the product being sold. That is not the law.

The majority uncritically rely for that assumption, as did the trial court, on a statement in *Dooley's Hardware Mart* v. *Food Giant Markets, Inc.* (1971)

21 Cal.App.3d 513, 518 [98 Cal.Rptr. 543] *(Dooley's Hardware)*, that a UPA defendant may rebut the statutory presumption of intent or purpose to injure competitors or destroy competition "either by evidence tending to bring them within one of the exceptions to the prohibitions contained in the Act *or by evidence establishing otherwise that they did not have the requisite wrongful intent.*" (Italics added, fn. omitted.)

A careful reading of *People* v. *Pay Less Drug Store* (1944) 25 Cal.2d 108, 114 [153 P.2d 9] *(Pay Less)*, on which the Court of Appeal relied in *Dooley's Hardware*, reveals however that this court's statement that nonstatutory bases may exist by which to rebut the presumption that arises from below-cost sales was dictum. The defendants in *Pay Less* conducted a retail grocery business. They admitted below-cost sales of more than 400 items as "loss leaders" but denied intent to injure competitors or destroy competition. They claimed that the sales were made in a good faith effort to meet the legal prices of competitors, and thus relied only on subdivision (d) of section 17050 in their effort to rebut the presumption of injurious purpose or intent. In response to the defendants' claim that the presumption was unconstitutional, this court addressed the nature of the presumption now codified as section 17071 and the means by which it may be rebutted. "Proof of injurious effect is permitted to be shown with the proof of sales below cost as presumptive or prima facie evidence that the requisite intent existed. The obvious and only effect of this provision is to require the defendants to go forward with such proof as would bring them within one of the exceptions or which would negative the prima facie showing of wrongful intent. They may present facts showing that they were within the express exceptions regardless of actual intent; or they may introduce evidence of another *necessity* not expressly included to show that sales were made in good faith and not for the purpose of injuring competitors or destroying competition." *(Pay Less, supra,* 25 Cal.2d at p. 114, italics added.)

The court noted that it was unnecessary in the *Pay Less* case to consider what circumstances other than those expressly designated in section 17050 would justify sales below cost and thus negate the prima facie showing of unlawful intent since the defendants relied only on the exception found in subdivision (d) of the section. Nothing in *Pay Less* warrants a conclusion that, in stating that there might be circumstances other than those set forth in section 17050 on which below-cost sales could be justified, this court contemplated that price competition alone could justify below-cost sales. To have done so would have read the "good faith" effort to meet a competitor's

"legal price" out of the statute. Instead, the court referred to another "neces-sity" to resort to below-cost sales. Competition alone cannot create such a necessity.[5]

When construing a statute a court must consider the entire statutory scheme of which it is part and give effect to all parts of the statute, avoiding an interpretation that would render any provision nugatory. (*People* v. *Pieters* (1991) 52 Cal.3d 894, 898-899 [276 Cal.Rptr. 918, 802 P.2d 420]; *Lungren* v. *Deukmejian* (1988) 45 Cal.3d 727, 735 [248 Cal.Rptr. 115, 755 P.2d 299].) Subdivision (d) of section 17050 provides that below-cost sales do not violate the UPA when they are made in an effort to compete with what the seller in good faith believes is a legal price of a competitor. That legislative limitation on competitive below-cost sales is rendered nugatory by a construction of section 17043 which permits a seller to price its products below its cost to meet any competitor's price regardless of whether there is a good faith belief that the competitor's price is itself legal. The Legislature did not intend that a below-cost seller could avoid the require-ment of a good faith belief that the competitor's price was legal by simply proving that it intended only to compete and meant no harm. The majority's contrary conclusion virtually ensures the end of meaningful competition in some product areas. As long as a below-cost seller intends no evil, it is free to wreak havoc on the competitive market for the product it sells below cost regardless of its knowledge of the impact of its action on other sellers of the same or a similar product.

The majority construction of the UPA also creates uncertainty over poten-tial UCL liability, uncertainty that exists only because the majority hold that

[5]*Tri-Q, Inc.* v. *Sta-Hi Corp.* (1965) 63 Cal.2d 199 [45 Cal.Rptr. 878, 404 P.2d 486], is not authority for such an exception to the limited circumstances in which section 17050 author-izes below-cost sales. There, under pre-1985 procedures, a single appeal in consolidated cases was before this court on grant of hearing. The discussion of the section 17071 presumption there was in the portion of the vacated Court of Appeal opinion which addressed a UPA cause of action. This court adopted that part of the opinion because neither of the parties raised any issue as to its adequacy in the petition for hearing. (63 Cal.2d at p. 203.) The first issue addressed was whether the defendant corporation had sold its product below cost. The trial court found and the Court of Appeal agreed that the evidence supported its finding that under applicable accounting practices the product was not sold below cost. Moreover, the corpora-tion did not intend to sell below cost. In that context the opinion states: "That evidence was sufficient to render the presumption embodied in section 17071 of the Business and Profes-sions Code of little evidentiary value. Consequently, it does not appear to be probable that a result more favorable to the plaintiff Tri-Q, Inc., would have been reached by the trial court even if it had found that such prices were less than the actual cost of the product." (*Id.* at p. 209.)

That dictum in *Tri-Q, Inc.* v. *Sta-Hi Corp., supra,* 63 Cal.2d 199, 209, at best stands for the proposition that a good faith belief that a product is not being sold below cost is a defense to a section 17043 action.

the UPA does not expressly make below-cost sales for the purpose of competition lawful. I cannot agree. Section 17050 does make below-cost sales lawful in the circumstances specified therein. However, properly construed, unless an exception other than described in subdivision (d) of section 17050 is applicable, the UPA permits below-cost sales only when made to meet what is believed in good faith to be a *legal* price of a competitor. If that belief is present the sale is lawful and does not violate either the UPA or UCL. If it is absent the sale is both a violation of the UPA and the UCL.

The legislative limitation on below-cost sales in subdivision (d) of section 17050 to those made in a good faith belief that the price with which the seller is competing is legal does not deny the seller a fair opportunity to compete. When a seller is faced with competition from what appear to be unlawful below-cost sales by a competitor, the UPA provides the seller with a remedy other than further injury to any remaining competitors and potential destruction of the remaining market through its own below-cost sales. That remedy is a UPA-authorized injunction (§ 17070) to force the competitor to discontinue unlawful below-cost sales. "Each side must obey the law; the fact that one competing party disregards the statute does not give the other side a legal excuse to do so." (*Page* v. *Bakersfield Uniform etc. Co.* (1966) 239 Cal.App.2d 762, 770 [49 Cal.Rptr. 46].)

The record reflects that in general L.A. Cellular established a wholesale price for cellular phones at 6 percent above its cost,[6] and a retail price at 2 percent higher. It had a "meet comp" (meet competition) policy, however, which sometimes affected the retail price at which it made retail sales and priced phones sold to its agents. In December 1993 the vice-president of sales and marketing for L.A. Cellular circulated a memorandum on hardware pricing and promotions to its agents. The memorandum stated that L.A. Cellular planned "to continue the policy of meeting what we believe to be the legal hardware prices of our primary competition(s)." The vice-president of sales and marketing testified that AirTouch (and its agents) was then its primary competitor. L.A. Cellular's guidelines, however, were only to monitor competitors' ads, TV, radio, and print media and to consider dropping its prices to meet prices that were below that at which L.A. Cellular was selling equipment. Its guideline was to match the offers made by AirTouch as closely as possible, although it did not do so in all cases. This witness conceded that AirTouch prices did in some cases seem to be suspiciously low and he did not know what AirTouch's costs were. In many cases,

---

[6]Under section 17026, 6 percent is prima facie proof of the cost of doing business which must be added to the invoice or replacement cost of an item in establishing whether a product is sold below cost.

however, L.A. Cellular was selling below its cost. At this time "bundling" was not authorized in California, but L.A. Cellular had found a high correlation between sales of equipment and activation.

L.A. Cellular's aggressive pricing during 1993 resulted in a 56 percent increase in December 1993 activations over its activations in December 1992, a factor it attributed to having "cornered the market for mass marketing of equipment." During that period its price for one cellular phone product dropped from $399 to under $149. The witness conceded, however, that L.A. Cellular's price drop was not simply to compete with AirTouch, but because it wanted to meet the AirTouch competitive reaction to L.A. Cellular's price reductions.

The record is ambiguous with regard to whether defendant had a good faith belief that AirTouch or any sellers of cellular telephones whose price it was attempting to meet with its below-cost sales were selling the equipment below cost or, if so, were nonetheless selling cellular telephones at a legal price. The vice-president of sales and marketing testified that L.A. Cellular's marketing staff watched AirTouch ads and set its prices accordingly.[7] While they were not comfortable meeting the prices offered in advertisements from some sellers whose affiliation they were not sure of, L.A. Cellular "felt that if AirTouch had a broadly advertised price point, that we were reasonably comfortable they were doing it within the law." They did attempt to determine if a competitor's price was legal by talking with the manufacturers of the equipment, but the response from manufacturers with whom L.A. Cellular already had a relationship was "none of your business." They recognized that Motorola, which manufactured cellular phones sold by both L.A. Cellular and AirTouch also provided switching equipment to AirTouch and assumed that moneys might be applied "across those relationships." In the end, however, the belief was simply that the manufacturer probably had a pricing strategy for AirTouch that was similar to that for L.A. Cellular and a feeling that AirTouch would not want to hazard legal exposure by its pricing actions. No similar effort was made to determine the lawfulness of competitor's prices when the West Los Angeles super store policy was followed. If a person came into that store with a competitive ad at a lower price, the salesperson could meet that price with management authorization.

---

[7]Before it initiated a general practice of below-cost equipment sales in conjunction with sales of cellular service, L.A. Cellular sold equipment below cost at its "super store" in West Los Angeles when asked by a customer to meet the price of another retail seller with an adjacent business because that seller was offering lower prices. When it did so, it had the customer execute a document in which the customer stated that the customer was making the certificate to induce L.A. Cellular to sell the equipment at a price competitive with a named competitor pursuant to section 17050, subdivision (d) and that the *customer* had no reason to believe that the competitor's price was not a lawful price.

Thus, the record may support a finding that L.A. Cellular had a good faith belief that when it made below-cost sales to compete with AirTouch it was competing with a legal price. On the other hand, it does not appear to support a finding that all of the below-cost sales were made to compete with what L.A. Cellular believed in good faith was a legal price.

Regardless of whether there is a distinction between the mental elements of purpose and intent, plaintiffs established a prima facie violation of section 17043. Their evidence established below-cost sales of cellular phones and injurious effect. Defendant's evidence could not rebut the presumption of intent to injure competitors unless the concededly below-cost sales were made with a good faith belief that the prices of the competitors which defendant endeavored to meet were legal prices. That factual issue is one for the trial court. The judgment for defendant on the UPA causes of action should be set aside and the matter remanded for trial.

IV

*Reconciling Federal Competitive vs. Predatory Pricing Doctrine With the UPA and UCL*

A "predatory pricing scheme" such as one forbidden under the Sherman Act (15 U.S.C. § 2)[8] generally encompasses (1) below-cost pricing which (2) will drive competitors out of the market or deter others from entering, the ultimate object of which is to enable the predator to recover its losses through higher prices in the monopolistic market created thereby. (*Brooke Group Ltd.* v. *Brown & Williamson Tobacco Corp.* (1993) 509 U.S. 209, 222-224 [113 S.Ct. 2578, 2587-2589, 125 L.Ed.2d 168]; *Matsushita Elec. Industrial Co.* v. *Zenith Radio* (1986) 475 U.S. 574, 584, fn. 8 [106 S.Ct. 1348, 1354-1355, 89 L.Ed.2d 538].) The UPA ban on below-cost pricing has the same objective. Establishing a violation under the UPA is less cumbersome, however, as the plaintiff need only prove below-cost pricing and injury to a competitor or to competition. By limiting the circumstances in which below-cost pricing is exempted from the ban of sections 17043 and 17044, the UPA assumes that below-cost sales in other situations will result in monopolistic control of a market as sellers unable to compete with below-cost sales are driven out. Thus, a UPA plaintiff need not demonstrate that the below-cost seller anticipates recoupment of losses in the monopolistic market, the second prong of the predatory pricing test applied under federal law.

---

[8]Title 15 United States Code section 13a (the Robinson-Patman Act) prohibits, inter alia, selling "goods at unreasonably low prices for the purpose of destroying competition or eliminating a competitor."

The majority construe the UPA as permitting a product to be sold at a price *below cost in order to compete with a competitor's price, be that price* legal or otherwise, without violating the UPA even if the seller knows that the sales will injure competitors and potentially destroy competition as long as the seller does not subjectively intend harm to the competitors or to competition. They also hold, however, that this conduct may subject the seller to liability under the UCL. The result is that conduct which is "predatory" and thus unlawful under federal antitrust law is permitted under the UPA, although there is no reason to believe that, in enacting the UPA proscription of below-cost pricing, the California Legislature intended to afford California consumers less protection than did Congress when comparable federal antitrust legislation was adopted. In fact California law appears to afford greater protection since it protects competitors as well as competition against discriminatory pricing, and permits recovery without the showing required under the second prong of the federal "predatory" pricing test. Moreover, in holding that a seller that believes its conduct is permissible under the UPA may nonetheless be subject to suit under the UCL, the majority create a new arena of uncertainty for the business community. The potential impact of UCL liability is minimized by the majority, but, in fact, a UCL suit exposes a business to substantial risks. (See, e.g., *Stop Youth Addiction, Inc.* v. *Lucky Stores, Inc.* (1998) 17 Cal.4th 553 [71 Cal.Rptr.2d 731, 950 P.2d 1086].)

As I have demonstrated above, the UPA and UCL are subject to a construction which would avoid having conduct that is lawful under the UPA deemed "unfair" under the UCL. A construction of the UPA which bans all below-cost pricing except that expressly permitted by section 17050, and thus permits below-cost pricing only to meet what is believed to be a competitor's legal price, would better protect consumers and would lessen uncertainty in the business community over the lawfulness of below-cost pricing. A pricing scheme that violated the UPA would necessarily violate the UCL, but would not otherwise constitute an "unfair" business practice.

The construction of the UPA and UCL that I propose would also be consistent with federal prohibitions on predatory pricing, which federal law distinguishes from pricing that is simply competitive. A California business that engaged in below-cost sales only to meet a competitor's legal price would not violate federal antitrust law in so doing. It might do so under the majority's construction of the UPA.

The UPA is, as this court recognized in *Stop Youth Addiction Inc.* v. *Lucky Stores, Inc., supra,* 17 Cal.4th at page 570, "roughly analogous to the federal

Clayton Act" in its prohibition of below-cost pricing and price discrimination. It should, therefore, be construed accordingly.

In construing either the state or the federal antitrust laws, the court should recognize that the overarching purpose of these laws is to protect the consumer, not the competitors of a business whose efficiencies enable it to sell its products at a low price. "Low prices benefit consumers regardless of how those prices are set, and so long as they are above predatory levels, they do not threaten competition." (*Atlantic Richfield Co.* v. *USA Petroleum Co.* (1990) 495 U.S. 328, 340 [110 S.Ct. 1884, 1892, 109 L.Ed.2d 333].)

Under federal law, a plaintiff alleging a violation need not prove that a competitor intends to injure the plaintiff or destroy competition.[9] The initial burden is only to establish that the price is predatory. To do so, "a plaintiff . . . must prove that the prices complained of are below an appropriate measure of its rival's costs" and "that the competitor had a reasonable prospect, or . . . a dangerous probability, of recouping its investment in below-cost prices. [Citations.] 'For the investment to be rational, the [predator] must have a reasonable expectation of recovering, in the form of later monopoly profits, more than the losses suffered.' [Citation.] Recoupment is the ultimate object of an unlawful predatory pricing scheme; it is the means by which a predator profits from predation. Without it, predatory pricing produces lower aggregate prices in the market, and consumer welfare is enhanced. Although unsuccessful predatory pricing may encourage some inefficient substitution toward the product being sold at less than its cost, unsuccessful predation is in general a boon to consumers.

"That below-cost pricing may impose painful losses on its target is of no moment to the antitrust laws if competition is not injured: It is axiomatic that the antitrust laws were passed for 'the protection of *competition*, not *competitors.*' " (*Brooke Group Ltd.* v. *Brown & Williamson Tobacco Corp.*, *supra*, 509 U.S. at pp. 222, 224 [113 S.Ct. at pp. 2587, 2588], original italics.)

The rationale underlying the federal approach to predatory pricing was explained in *Matsushita Elec. Industrial Co.* v. *Zenith Radio*, *supra*, 475 U.S. at page 589 [106 S.Ct. at page 1357]: "[T]he success of [predatory pricing] schemes is inherently uncertain: the short-run loss is definite, but the long-run gain depends on successfully neutralizing the competition. Moreover, it is not enough simply to achieve monopoly power, as monopoly

[9]The concept of intent to injure has decreased in importance over the past 20 years. (See McCall, *Private Enforcement of Predatory Price Laws Under the California Unlawful Practices Act and the Federal Antitrust Acts* (1997) 28 Pacific L.J. 311, 331.)

pricing may breed quick entry by new competitors eager to share in the excess profits. The success of any predatory scheme depends on *maintaining* monopoly power for long enough both to recoup the predator's losses and to harvest some additional gain." "In order to recoup their losses, [predators] must obtain enough market power to set higher than competitive prices, and then must sustain those prices long enough to earn in excess profits what they earlier gave up in below-cost prices." (*Id.* at pp. 590-591 [106 S.Ct. at p. 1358].)

As explained by authors Areeda and Turner, whose reasoning apparently underlies the current federal approach (see *Brooke Group Ltd.* v. *Brown & Williamson Tobacco Corp.*, *supra*, 509 U.S. at pp. 221-222, 225 [113 S.Ct. at pp. 2586-2587, 2589]), rational business behavior seeks to maximize profits. Each competitor in a given market is attempting to attract more business. In most instances, one sale by a business translates to one sale lost by its competitors. It is a benefit to consumers to have such a system because businesses attempt to beat out their competitors by underselling them, thus attracting consumers. In a highly competitive market, prices approach the level of cost. It would be deemed irrational in the short run for business to sell below cost because a business is a profit-seeking entity. Thus, when an item is sold below cost, it is reasonable to presume a motive other than competition on the merits. (See Areeda & Turner, *Predatory Pricing and Related Practices Under Section 2 of the Sherman Act* (1975) 88 Harv. L. Rev. 697.)

L.A. Cellular's conduct might not violate federal antitrust law. While it was able to recoup its losses, and clearly anticipated that it would be able to do so, that recoupment was in profits from increased sales of its cellular service, not cellular phones. Moreover, while these plaintiffs were injured by defendant's below-cost sales, competition was not. The record confirms that the cellular telephone business in the Los Angeles area continued to grow and new retailers continued to enter the market. Thus, competition continued in both the cellular phone and the cellular service markets. L.A. Cellular did not achieve and the record does not suggest that it intended to achieve or sustain monopoly power in the cellular phone market.

Nonetheless, insofar as the UPA is broader than federal antitrust law and does give broader protection to competitors, as does the UCL (*Barquis* v. *Merchants Collection Assn.* (1972) 7 Cal.3d 94, 109-111 [101 Cal.Rptr. 745, 496 P.2d 817]), the purpose or intent element of California law may be conformed to federal law by the construction of the UPA suggested above. Recognizing that intent or purpose to injure competitors or destroy competition is presumed whenever a product is intentionally (*Tri-Q, Inc.* v. *Sta-Hi*,

*supra*, 63 Cal.2d at pp. 207-208) sold below cost, unless section 17050 exempts the sale, would bring California antitrust law into conformity with the first prong of the federal test of predatory pricing. It would also carry out more fully the legislative intent of protecting competitors as well as consumers from the impact of below-cost pricing.

Requiring proof of subjective intent to injure competitors, or as the majority do, permitting the presumption of intent or purpose to be rebutted by proving simply lack of such intent, is not appropriate in the competitive business arena. "[C]utting prices in order to increase business often is the very essence of competition." (*Matsushita Elec. Industrial Co.* v. *Zenith Radio, supra,* 475 U.S. at p. 594 [106 S.Ct. at p. 1360].)

Any price cut which attracts a consumer who would have gone to another seller, harms the seller that did not make the sale. Evidence that the below-cost seller did not intend to injure is meaningless. To intend to compete through below-cost sales is, necessarily, to intend to injure a competitor. For this reason the UPA does not require proof of intent to injure, but instead presumes that intent exists for purposes of section 17043 and 17044 when a business engages in below-cost selling.

Modern economic theory assumes that a business with prices lower than those of its competitors intends harm to the competitors insofar as it is able to attract customers who would otherwise trade with the competitors. Since this behavior stimulates competition it benefits consumers. Therefore, it is inappropriate to import into antitrust law the criminal law concept of intent or purpose to cause injury as a state of mind warranting punishment. Subdivision (d) of section 17050 demonstrates that the California Legislature did not intend to do so. Antitrust law encourages the state of mind of beating competitors through lower prices because, to a certain point, consumers benefit. It is only when "[a] firm . . . drives out or excludes rivals by selling at unremunerative prices [that it] is not competing on the merits, but engaging in behavior that may properly be called predatory." (Areeda & Turner, *Predatory Pricing and Related Practices Under Section 2 of the Sherman Act, supra,* 88 Harv. L.Rev. at p. 697.)

The UPA draws the predatory price line at average total cost. (§§ 17026, 17029.) No article or product may be sold at a lower price unless permitted by section 17050 because intent to injure rather than compete on the merits is presumed when pricing is predatory.

This court should, to the extent possible under the language of California antitrust laws and consistent with legislative intent, construe the purpose or

intent provision of the UPA in conformity with federal law. Uniformity benefits both the business community and the consumers for whose protection these laws were enacted.

For all of the above reasons, I believe that the judgment for defendant on the UPA cause of action should be set aside and the matter remanded to the superior court for trial on both the UPA and UCL causes of action.